(140 App. Div. 329.)

## In re ROBINSON.

(Supreme Court, Appellate Division, First Department.  October 21, 1910.)

1. ATTORNEY AND CLIENT (§ 39*)—DISBARMENT—CONVICTION OF OFFENSES.
   The conviction of an attorney of a misdemeanor does not of itself disbar him.
   [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 52; Dec. Dig. § 39.*]

2. ATTORNEY AND CLIENT (§ 39*)—MISCONDUCT OF ATTORNEY—DISBARMENT.
   An attorney, convicted in the federal court of obstructing the administration of justice, by directing a person to evade service on him of a subpœna to appear before a federal grand jury investigating the affairs of a corporation in which the attorney is a director, and the affairs of the president of the corporation, is convicted of an offense directly relating to his professional duty and in direct violation of it, justifying proceedings to discipline him, and his ignorance of the federal statutes punishing his act does not prevent a state court from disciplining him.
   [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 52; Dec. Dig. § 39.*]

3. ATTORNEY AND CLIENT (§ 39*)—MISCONDUCT OF ATTORNEY—DISBARMENT.
   That the federal judge, before whom an attorney was convicted of obstructing the administration of justice, in violation of federal statutes, recommended to the Bar Association and to the judges of the circuit that they forgive the attorney, does not prevent a state court from disciplining the attorney for his professional misconduct.
   [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 52; Dec. Dig. § 39.*]

4. WITNESSES (§ 199*)—ATTORNEY AND CLIENT—RELATION.
   An attorney, who accepts the office of director of a corporation, is thereby removed from the relation of attorney to the officers of the corporation, so far as the corporate affairs are concerned, and his claim that he is privileged from answering questions in a judicial proceeding as to his knowledge of the affairs of the corporation is unfounded.
   [Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 749–751; Dec. Dig. § 199.*]

5. ATTORNEY AND CLIENT (§ 58*)—MISCONDUCT OF ATTORNEY—PUNISHMENT.
   In proceedings to discipline an attorney for obstructing the administration of justice, in violation of the federal statutes, for making false statements to a federal judge to deceive him, and for falsely claiming the privilege not to testify in a judicial proceeding, evidence *held* not to justify the penalty of disbarment, but only his suspension from practice for one year.
   [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 76–78; Dec. Dig. § 58.*]

   Laughlin, J., dissenting in part.

Proceedings to discipline Sanford Robinson, an attorney.  Judgment suspending the attorney from practice for a specified time.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

Joseph H. Choate, Jr., for petitioner.
Adrian H. Joline and Henry B. Twombley, for respondent.

INGRAHAM, P. J.  The Association of the Bar of the City of New York presented to this court charges against the respondent, ask-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ing for such action as justice should require. The respondent answered such charges, and the matter was referred to a referee (135 App. Div. 924, 120 N. Y. Supp. 1143), who has now reported, and upon the testimony taken before the referee and his report the proceeding is now before us for final disposition.

The petition alleged presented three charges against the respondent. The first charge was that the respondent had unlawfully and willfully obstructed, resisted, and opposed the United States deputy marshal in attempting to serve a subpœna upon one Buckingham, for which offense he was indicted by a grand jury in the United States Circuit Court under sections 5398 and 5399 of the Revised Statutes of the United States (U. S. Comp. St. 1901, pp. 3655, 3656), was tried upon said indictment and convicted, and sentenced to pay a fine of $250. The second charge relates to the proceeding before Judge Lacombe, of the United States Circuit Court, in relation to the examination by respondent before a grand ·jury in that court, in which it is alleged that the respondent made certain statements to Judge Lacombe which were untrue, and which were made with the purpose of deceiving the. court, so that certain books of a corporation then under investigation by the grand jury could not be obtained. The third charge was that the respondent appeared before a grand jury of the United States in ·the course of an investigation being duly conducted by it, was sworn as a witness, and in the course of his examination he refused to testify in regard to a certain matter about which he was interrogated, upon the ground that such investigation referred to a conversation between himself and one Arthur P. Heinze, who was his client, and that said conversation was privileged, which position was false, and which privilege he was not justified in claiming. After a very careful and full investigation, the learned referee has reported the facts as established before him, with the conclusion that justice does not require that the respondent be subjected to punishment or discipline by reason of any of the matters referred to in the petition.

An examination of the testimony before the referee justifies the court, I think, in accepting his finding as to the facts, and in disposing of this proceeding the court will accept such findings as established. There are conclusions of the referee, however, which are based upon the facts as found by him, which this court cannot accept. The respondent was a young gentleman born in Massachusetts, whose ancestors had borne a high reputation for generations. He was educated at Williams College, from which he was graduated, receiving his professional education at the Harvard Law School, from which he also was graduated with honor, was admitted to the bar of Massachusetts, and after practicing there for some time was admitted in New York. He is now 36 years of age, and hitherto has borne an excellent reputation both in professional and private life. He was not a youth of inexperience and lacking in educational advantages, and therefore is without the excuse, which is often pressed upon us, that in consequence he did not possess that appreciation of the ethics of the profession and the duties which an attorney and counselor at law owes to his profession, to the courts of which he is an officer and to the public. He would seem to have had important professional busi-

ness, which included a retainer by Fritz Augustus Heinze, who appears to have been an officer and director in several large corporations, and whose acts were being investigated by the grand jury of the United States Circuit Court under charges which involved criminal offenses. The respondent had not only been retained as counsel for this gentleman, but also for one or more corporations in which he was interested, and at the same time had been made a director of a copper company in which it would appear that Mr. Heinze was the president and controlling influence.

In the course of the investigation of the federal grand jury into Mr. Heinze's acts, the grand jury desired the production before it of certain books of this copper company, and subpœnas had been issued requiring their production. It is quite evident from the testimony that the employés of this copper company were endeavoring to prevent the production of these books and the thorough investigation which the federal authorities desired of the affairs of this corporation. The respondent, as before stated, had been retained in a professional capacity by Mr. Heinze, and was also a director of this copper company. In the course of the proceeding against the copper company it was discovered that some of the books of the copper company had been mutilated by the removal of several pages, and respondent instituted, as he says, with the consent of Mr. Heinze, an investigation to discover who had caused such a mutilation. While engaged in this investigation he was satisfied that one Buckingham, an employé of the copper company, was connected with the mutilation, and was at the office of the company to interrogate Buckingham. While thus engaged a deputy United States marshal came to the office of the company with a subpœna to serve on Buckingham, and a messenger brought word to Buckingham that the said marshal wanted to see him. Buckingham asked the respondent if he should see him, whereupon the respondent told him not to. Buckingham acted on such advice, refused to see the marshal, and the subpœna was not served. Subsequently Buckingham departed for Canada, and the grand jury was prevented from examining him at that time. For this offense the respondent was indicted by the grand jury. The indictment contained three counts, on the third count of which he was convicted. This count alleged that the grand jury were investigating certain violations of section 5209 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 3497), pertaining to national banks, whereby it was charged by the United States attorney that one Fritz A. Heinze, as president of the Mercantile National Bank of the City of New York, had violated such section of the Revised Statutes; that to enable them to perform their duties a writ of subpœna was issued, directed to Buckingham, commanding him to appear before the grand jury and testify on behalf of the United States in the matter of the said violations and inquiry; that such subpœna was delivered to a deputy of the marshal of the United States for service on the said Buckingham, who went to the office of the United Copper Company in the city of New York to serve the said subpœna, and would have then and there found the said Buckingham and duly served him with

the said writ, but that the respondent, being present in the office of the said United Copper Company, knowing that the said writ had been so issued and that the said writ was in the hands of the marshal, unlawfully and corruptly did impede the due administration of justice in the said court by knowingly, willfully, and corruptly warning the said Buckingham, and knowingly, willfully, and corruptly advised and directed the said Buckingham to secrete and conceal himself from and avoid the marshal and evade the service of the writ, all of which the said Buckingham, in pursuance of said advice and direction of the respondent, thereupon immediately did, whereby and by reason of the said unlawful and corrupt advice and direction of the said respondent the marshal was prevented from serving the writ upon Buckingham, and the due administration of justice in the said court was impeded. Upon this indictment the respondent was arrested and arraigned, demurred to the indictment, which demurrer was overruled, pleaded not guilty, and was tried, convicted, and duly sentenced by the court to pay a fine of $250. All of this is not disputed.

This offense being a misdemeanor, the conviction did not of itself disbar the respondent, as it would have disbarred him, had the offense been a felony. The learned referee in his report states that upon the evidence before him he was satisfied that the respondent had no knowledge of these sections 5398 and 5399 of the Revised Statutes of the United States, and he was therefore relieved from any intent, corrupt or otherwise, to violate these sections by the fact that he was in utter ignorance of their existence. The referee then states that an indictment for a misdemeanor, followed by a conviction, does not necessarily imply any moral delinquency, and is not per se an impairment of the good character of the person convicted. He then calls attention to several acts which by law are made misdemeanors, namely, to ride on a freight car without permission; to get on a car or train while in motion for the purpose of becoming a passenger; to willfully wear, unless entitled to, the badge or button of the Grand Army of the Republic; to offer skimmed milk for sale without disclosing its quality—and states that a conviction for any of these offenses would not demonstrate that the party convicted was depraved or of bad character, and would not affect his standing socially or otherwise as a citizen, and that, if he chanced to be a lawyer, such conviction would not prove his unfitness for that honorable office or call for the exercise by the court of its disciplinary powers. While it may be that many acts, which would include some of those named by the referee, and which are made misdemeanors, in the absence of an intentional violation of the law, would not of themselves prove such a character as would justify the court in disciplining an attorney guilty of them, such illustrations are hardly relevant where an attorney has been guilty of the offense of impeding and obstructing the administration of justice, whether that particular offense is made a misdemeanor or not.

As an illustration of the nature of offenses the commission of which would not carry with it a duty to discipline an attorney, a charge of a deliberate attempt to impede the administration of justice is hardly

to be likened to the act of getting on a street car when in motion to become a passenger, or a violation of a corporation ordinance which involves a mere matter of neglect or inattention.   What this indict-ment charged this respondent with was an act which willfully and intentionally obstructed the court in its administration of the criminal law, and of that offense this respondent has, after a trial, been con-victed by a jury, and upon such conviction a judgment has been en-tered, which has resulted in the infliction upon him of the penalty pro-vided by law.   This was an offense which directly related to his pro-fessional duty and was in direct violation of it.   Because of the as-sumed analogy of getting on a street car when in motion or selling skimmed milk without disclosing its nature to the offense for which this respondent was indicted and convicted, the learned referee pro-ceeded to retry the case and determine whether or not he considered the respondent guilty of the crime of which he was charged, and has ex-pressed the opinion that he did not intend to violate the statutes, of which he had no knowledge, and, inferentially, has also expressed the opinion that he was not guilty of the charge of which he was con-victed.   The fact, however, stands that he was tried by a jury, with all the safeguards which the law throws round a person accused of a crime, convicted of the charge, and the learned judge who presided evidently considered such a conviction sustained by the testimony be-fore him, for he imposed upon him the penalty provided by law for the offense.

It is suggested that, if the respondent had been defended by a more experienced counsel, he might have avoided the conviction; but this opinion seems to be based upon the conclusion that has been drawn from the nature of the offense as disclosed in the testimony before the referee.   We have examined the record of that trial, and have failed to discover any evidence of negligence or lack of skill on the part of the counsel who conducted the defense.   The respondent tes-tified in his own behalf, and was afforded every opportunity to meet and explain the charge against him.   The fact, however, remains that the respondent has been indicted and convicted of the offense of will-fully and intentionally obstructing the administration of justice, and in determining what discipline should be imposed for such an offense we cannot escape the fact of such charge, indictment, and conviction. In relation to the offense itself, the learned referee has found that the respondent had no intention of committing it.   The fact as to wheth-er or not he knew of the statute of the United States, and knew that an act which directly did obstruct the administration of justice could be punished criminally or not, is of no importance.   The question is, not whether he knew that he was violating the law, but whether, in doing what he did, he was guilty of gross unprofessional conduct. The fact that he did violate a law and was convicted of it is important as evidence that he has been adjudged guilty of such conduct, evi-dence which certainly would be conclusive against him in any pro-ceeding in which the United States was a party, and which we are not justified in disregarding.   The circumstances, however, under which the offense was committed, and the facts in relation to the acts of the

respondent at the time he committed the acts which were the basis of the charge, are important for us in considering the punishment that should follow.

The referee is satisfied that the respondent did not know, at the time he advised Buckingham not to see the marshal, that the marshal had in his possession a subpœna requiring Buckingham to appear before the grand jury; that his advice to Buckingham not to receive the messenger from the United States district attorney was because he wished to obtain from Buckingham all the information possible as to the mutilation of these books, which subject he was then investigating; but just how that could interfere with his investigation is not very apparent. The respondent knew that the affairs of Heinze and his associates were then under investigation by the grand jury; that the United States attorney desired the production or inspection of these books of the copper company; and it is difficult to imagine what the respondent could have thought that a messenger from the attorney of the United States could have wanted with an employé of this copper company, whose books were required by the governmental officials, except to procure the attendance of that person as a witness. It is significant to note that at or about this very time the respondent advised another employé of the company to accept service of a subpœna, making the significant remark concerning him that he knew nothing about the books, while he makes it quite clear that he was thus satisfied that Buckingham, whom he advised not to accept a subpœna, knew a very great deal about the books and their mutilation. That the object of the respondent was to prevent a communication between the representatives of the United States attorney and Buckingham is admitted, and by his advice and interference he attained that object. This is not conduct consistent with the attitude an attorney should bear towards the courts, when investigating, as he knew they were investigating, a criminal offense. We are therefore compelled to disagree with the conclusion of the learned referee that there was nothing in the respondent's history during May and June, 1909, that can in fairness or justice be said to put a stain upon the good character he had theretofore maintained.

In relation to this charge, much stress is laid by the respondent upon the observation of the learned judge who tried the case in the United States Circuit Court that he recommended to the Bar Association and to the judges of the circuit that they forgive the respondent. The judges of the United States circuit are responsible for the character of the attorneys that practice in the United States courts, but in relation to attorneys of the Supreme Court of the state of New York this court is responsible.

The second and third charges are connected with the acts of the respondent in appearing before the grand jury and insisting upon his privilege when interrogated about the books of this copper company, and his further statement to Judge Lacombe when he was before the court upon an application to commit him for contempt in refusing to answer. The respondent was the director of a corporation as to the whereabouts of whose books the grand jury was investigating. His

knowledge as to the affairs of the corporation of which he was a director was clearly knowledge that he was bound to disclose. It seems grotesque to say that he could claim to be privileged from answering in relation to corporate acts of a corporation of which he was a director because he had professional relations with its president or other directors. When the corporation made him a director, and he accepted that office, such acceptance necessarily removed him from the relation of attorney or counsel to its officers, so far as the corporate affairs were concerned, and the claim of an attorney and counselor at law of the professional acquirements and standing of the respondent that he was entitled to claim such a privilege and insist upon a refusal to answer on that ground can hardly be believed to have been made in good faith and with the honest conviction that the objection was available. He had been investigating the mutilation of these books; he had been informed by the officers of the company that the books had been removed; and, whether these officers were his clients or not, he was certainly bound to disclose to the grand jury the knowledge that he had on the subject. It is also a little difficult to accept the explanation of his conduct before Judge Lacombe, when he was asked by Judge Lacombe if he knew anything about these books. The referee, however, has accepted, and we accept, the statement of Judge Lacombe, as to his conviction, that there was no intent to deceive the court in the statement that the respondent made to him. That seems to have been based upon what appeared to be the mental condition of the respondent at the time he appeared before the court, and justifies this court in treating the incident much less seriously than, but for this statement, it would have to be treated.

The respondent in this case was in the employ of clients who were supposed to have great wealth and who were at the head of important corporations. The impression that they are immune from civil or criminal prosecution for their acts seems to have pervaded the community of late years, and with it has grown up a sentiment among many members of the profession that, in carrying out their behest, a lawyer is performing his duty to the profession, to the public, and to the courts. It is the importance, or assumed importance, of the client, which is sought to justify acts which would be at once condemned in connection with a client who did not have great wealth or great prominence. If the profession is to have the respect of the community, if it is to be trusted by courts and by others who have to do with the administration of justice, its members must realize that a crime is a crime, whosoever commits it, and, while the highest as well as the lowest criminal is entitled to the protection that the law gives, is entitled to have counsel of his selection, and is entitled to all the safeguards that have been devised for his protection, neither his wealth nor prominence will protect a lawyer in going outside of his professional obligations to shield him from the consequences of his acts.

I have thus indicated the considerations which have constrained me to radically differ from the learned referee as to the nature of the offense committed by the respondent and from his statement that there was "nothing in Robinson's eventful history during May and June,

1909, that can in fairness or justice be said to put a stain upon the good character he had theretofore maintained," or accepting his further recommendation that "justice does not require that the respondent be subjected to punishment or discipline by reason of any of the matters referred to in the petition herein." The respondent appeared before the referee and made a full disclosure, and the referee has acquitted him of any knowledge of the books and of any connection with their mutilation or removal. The excellent character that the respondent has received from many important gentlemen that have known him is entitled to consideration, and the expressions from the judges of the United States Circuit and District Courts are also to be considered, as is the fact that this is the first time that any charge of unprofessional conduct of any kind has been made against him. We also take into consideration the fact that the respondent's conduct, grave though it was, does not appear to have been induced by any sordid motives of personal gain, but to have resulted from excessive and ill-judged zeal to protect his clients from an impending catastrophe. This does not excuse, but in some degree serves to palliate, his offense.

In consideration of these circumstances, the court has concluded that it is not required to proceed to the extreme penalty of disbarment, but that the respondent should be suspended from practice for a period of one year.

CLARKE, SCOTT, and MILLER, JJ., concur.

LAUGHLIN, J. (dissenting in part). On reading the evidence, I became convinced that the respondent is guilty of the crime of having willfully impeded the administration of justice, for which he was duly indicted, convicted, and sentenced in the federal court, and also of the charge of having willfully deceived the federal court and grand jury. Moreover, in his testimony before the grand jury, on his own trial, on the trial of Arthur P. Heinze, and on this hearing, I think that he has shown a reckless disregard of the truth. As I view the evidence, he has clearly forfeited his right to the office of attorney and counselor, and the nature of the charges, satisfactorily established, and his recklessness in testifying, merit extreme punishment, and, in my opinion, the dignity of the court and the good of the profession require that he should be disbarred.

However, since my Associates do not view the evidence as I do, and since I cannot yield my convictions, for they have been confirmed by reflection, I have determined, in deference to their views and to the decision about to be made, to withdraw my formal opinion setting forth and discussing the evidence upon which my convictions are founded, and to record my dissent with respect to the punishment and my vote for disbarment on this memorandum.