# SUPREME COURT — SPECIAL TERM — NEW YORK.

## September, 1916.

## THE PEOPLE v. ROBERT W. HEBBERD.

### (96 Misc. 617.)

CRIMINAL LAW—INFORMATION LODGED WITH JUSTICE OF THE SUPREME
COURT SITTING AS A COMMITTING MAGISTRATE—INFORMATIONS FOR
CRIMINAL CONSPIRACY IN PERVERTING AND OBSTRUCTING JUSTICE FOR
CRIMINAL LIBEL AND FOR PERJURY CONSIDERED, AND DISMISSED—
INFORMATION FOR WRONGFULLY OBTAINING KNOWLEDGE OF TELEPHONIC
MESSAGES BY POLICE OFFICIAL DISMISSED.

STATE BOARD OF CHARITIES—INVESTIGATION AS TO ABUSES—JURISDICTION
OF COMMISSIONER APPOINTED BY GOVERNOR.

A justice of the Supreme Court sitting as a committing magistrate
is practically in the position of a trial justice upon the trial of an
indictment, and after all parties have rested it is his duty to deter-
mine whether upon all the evidence the defendant should be discharged
or the case submitted to the jury.

Upon the due transmission to the governor of the State of the
report of the commissioner of charities of the city of New York dis-
closing evils and abuses alleged to exist in child-caring institutions
receiving city support and made the basis of charges of negligence
against the State Department of Charities the governor pursuant to
section 8 of the Executive Law appointed a sole commissioner to
examine and investigate the management and affairs of the State
Board of Charities with power to subpoena and enforce the attendance
of witnesses, to administer oaths and require the production of any
books or paper deemed relevant or material. Upon the hearing of a
proceeding before a justice of the Supreme Court sitting as a com-
mitting magistrate with whom certain informations were lodged,
and upon consideration of the facts and circumstances leading up to
the charges made against defendants, held:

That the information against the police commissioner of the city
of New York charging him with wrongfully obtaining knowledge of
telephonic messages passing over the wires rented to and used by
certain labor organizations should be dismissed, the proof showing
the knowledge of conversations conducted over the telephone wires in

question was acquired by him solely in his official capacity as police commissioner for the purpose of detecting crime and, in fact, resulted in the conviction of a number of individuals, and that the knowledge of such conversations was utilized only for the purpose of detecting suspected criminality.

That the evidence on the hearing of an information against certain of the defendants charging them with conspiracy in perverting and obstructing justice and the due administration of the laws was insufficient to support an indictment for conspiracy and should be dismissed; that the commissioner was without power to conduct an investigation to ascertain the individuals who were responsible for the publication of various alleged libelous pamphlets on account of which said defendants were subpoenaed to testify; that said defendants would have been within their rights to refuse to testify as to the identity of the authors and instigators of said publications · on the ground that if they constituted a criminal conspiracy defendants could not be compelled to testify against themselves.

That the commissioner appointed by the governor having no jurisdiction to examine the defendants in the conspiracy charge, alleged perjured testimony given by one of said defendants on the examination of the conspiracy charge was not material to the investigation which the commissioner was empowered to make, and the crime of perjury could not be established and the information against said defendant for perjury should be dismissed.

That as to the information lodged against certain of the defendants for criminal libel by reason of the alleged publication of various pamphlets relating to persons engaged in the performance of a public duty, the evidence being to the effect that said defendants were influenced into believing the truthfulness of newspaper and other reports and there being no proof that the publication of said pamphlets was inspired by any personal grudge or spite or any motive ulterior to that which they believed affected the welfare of institutions in which they were interested, the conclusion was inevitable that said publications were not issued maliciously or with criminal intent and, hence, the informations should be dismissed.

HEARING upon informations lodged with a Supreme Court Judge siting as a committing magistrate.

*Edward Swann, District Attorney,* and *William Dean Embree, Assistant District Attorney,* for people.

*Martin W. Littleton,* for complainant, Doherty.

*Alfred J. Talley,* for John J. Dunn.

*Frank Moss,* for Robert W. Hebberd.

*Dean Potter,* for Daniel C. Potter.

*Alfred J. Talley* and *Meier Steinbrink,* for William B. Farrell.

GREENBAUM, J. (sitting as a committing magistrate).

The district attorney of the county of New York lodged with me six informations as follows: One against Robert W. Hebberd, Daniel C. Potter, William B. Farrell and John J. Dunn, charging them with the commission of a conspiracy in perverting and obstructing justice and the due administration of the laws; three against Farrell, Potter and Dunn for criminal libel by reason of the alleged publication of various pamphlets; one against Hebberd for perjury, and one which has no relation to the matters connected with the foregoing informations against Arthur Woods, police commissioner, charging him with wrongfully obtaining knowledge of telephonic messages passing over the wires rented to and used by certain labor organizations.

The customary procedure before committing magistrates of merely hearing the complaint and witnesses was not pursued in the hearings before me, for the reason that the matters involved were of an important public character and all the parties interested were desirous of having all the evidence in behalf of both prosecution and defense submitted to the magistrate, to the end that he might determine upon all the facts whether there was reasonable ground to believe that the defendants, or any of them, were guilty of the crimes charged.

The complainants and the defendants were represented by able counsel and submitted testimony covering all the available

evidence in support of the charges and the defenses thereto, as though the case were being tried before a court and jury.

A magistrate in such a hearing, as was here held, is necessarily placed in a position quite different from that where only the complainant and a few witnesses are examined, and where the magistrate is required to hold a defendant for indictment by a grand jury if upon the *ex parte* evidence there is reasonable ground to believe him guilty. People ex rel. Willett v. Quinn, 150 App. Div. 827, 27 N. Y. Crim. 388. In the pending cases the committing magistrate is practically in the position of a trial justice, before whom and a jury defendants are upon trial under indictments, and where, after all the parties have rested, he is obliged to determine whether, upon all the evidence, it is his duty to acquit or to submit the case to the jury.

The complaint against the defendant Woods was dismissed in open court immediately after the taking of all the proofs, for the all-sufficient reason that it was conclusively established that he had committed no crime, but that, on the contrary, the knowledge of conversations conducted over the telephone wires in question was acquired by him solely in his official capacity as police commissioner for the purpose of detecting crime, and which, in fact, resulted in the conviction of a number of individuals, and that the knowledge of such conversations was only utilized for the purpose of detecting suspected criminality.

Since the closing of the public hearings upon the other informations Daniel C. Potter, one of the defendants, has been removed by the hand of death from all earthly jurisdictions.

A proper understanding and appreciation of the law applicable to the situation as disclosed upon the proofs require a recital of the salient and controlling facts. In the fall of 1915 Mr. Kingsbury, the commissioner of charities of the city of New York, made a report disclosing evils and abuses alleged to exist in child-caring institutions receiving city support. This report was subsequently transmitted by the then acting mayor

of the city, Mr. McAneny, to the Governor of the State of New York, and made the basis of charges of negligence against the State Department of Charities. The Governor thereupon, pursuant to section 8 of the Executive Law, commonly known as the Moreland Act, appointed one Charles H. Strong as sole commissioner to examine and investigate the management of the State Board of Charities and certain State commissions not involved in the controversy, and to report to him " what recommendations may seem fitting with regard to the charges, if any, * * * relating to or affecting the several departments of the State under investigation."

Under the act and the commission itself Commissioner Strong was empowered " to subpœna and enforce the attendance of witnesses, to administer oaths, and to require the production of any books or papers deemed relevant or material." Accompanying the commission the Governor sent to Mr. Strong a copy of the report of the commissioner of public charities of the city of New York and a letter in which the Governor said: " The statement is made that the reports of inspections made by the State Board of Charities of institutions receiving public funds in the city of New York are widely at variance with the findings of the city department in relation to those institutions, and that certain of those institutions which have received the certificate of approval of the State Board of Charities have been found to be actually in an unfit condition to provide proper care for children heretofore sent to them. As a part of the inquiry which you are herein requested to make you will please make careful inquiry as to the matters referred to by the acting mayor." Mr. Strong thereafter held many hearings, extending over a considerable period of time, and took a large mass of testimony covering thousands of pages.

It may be here appropriate briefly to state who the defendants are and what interests they had in the matter of the charities investigation before Commissioner Strong. The defend-

ant John J. Dunn is a dignitary of the Catholic church of the rank of monsignor and holds the official position of chancellor of the diocese of New York. William B. Farrell· has been a priest of the Catholic church for twenty-five years and the pastor of the Church of St. Peter and St. Paul in the borough of Brooklyn for the past twenty-two years. He has been most actively identified with Catholic charities for many years and at one time was the treasurer and trustee of the Williamsburgh Hospital, a non-sectarian institution. Daniel C. Potter was a Baptist minister, and after relinquishing his ministry he served under three comptrollers of the city of New York in charge of the department concerned with the charitable institutions which received city aid. Robert W. Hebberd was commissioner of charities of the city of New York under Mayor McClellan's administration and subsequently· was appointed secretary of the State Board of Charities, from which he resigned in April of this year. The persons claimed to have been libeled are Commissioner Strong, John A. Kingsbury and William J. Doherty, the last named being the second deputy commissioner of public charities in the city of New York, and the complainant in all the informations affecting Messrs. Hebberd, Dunn, Potter and Farrell. Mr. Doherty, who is of the Catholic faith, was the executive secretary of the Catholic Home Bureau for fifteen years. He was also at one time associated with the order of Christian Brothers and a teacher in their schools. As a child he was brought up in a Catholic orphanage.

One of the vital issues involved in the charities investigation, and in respect to which diametrically opposing views are entertained by those interested in child-caring institutions, is whether what is known as the institutional system of caring for dependent children now prevailing in the State of New York is undesirable or whether it should be supplanted by the system in vogue in Massachusetts, where no orphan asylums exist, the orphan children being cared for in private homes.

It was shown that Massachusetts affords public aid to about 1,000 orphans under the farming-out system, whereas in New York about 23,000 orphans receive State aid. According to the testimony there were 39 children's institutions in 1913 which cared for 25,397 children at the cost per year of $3,906, $963.47, of which the city of New York paid $2,394,813.63. The 39 institutions above referred to may be classified religiously as follows: 18 Protestant, with 5,794 children; 17 Catholic, with 15,912 children, and 4 Jewish, with 3,691 children. In the Catholic church there are religious orders whose members dedicate their lives to works of charity, and the care of children is a special concern of this church. It seems to be undisputed that those connected with the administration of Catholic charities are imbued with the conviction that the institutional system of caring for the dependent child is an inseparable part of church activity and that any attempt to interfere with the institutionalism of Catholic charities is an assault upon the Catholic church itself. It was shown that the State Charities Aid Society, of which Mr. Homer Folks is secretary, is an earnest advocate of the plan of placing children in foster homes and that Charities Commissioner Kingsbury and his deputy, Mr. Doherty, are all ardent advocates of the home system of caring for orphans and strongly opposed to what is known as " institutionalism." It should also be noted that among the Protestant and Jewish charity workers there are divided opinions upon the question of institutionalism versus anti-institutionalism. As to the merits of this controversy the court is not here concerned. It is merely important to recognize that these differences do exist.

In this connection it may be observed that Mr. Kingsbury, shortly after his appointment as commissioner, appointed a committe of three, consisting of Dr. Reeder, Dr. Bernstein and Rev. Brother Barnabas, to investigate the orphanages which receive city aid. Brother Barnabas resigned from the commit-

tee, which was thereafter composed of Deputy Commissioner Doherty and Messrs. Reeder and Bernstein. This committee continued investigations during 1914 and 1915, and then presented reports which formed the basis of the charges preferred against the State Board of Charities, resulting in the appointment of the Strong commission.

At the hearings before Commissioner Strong the examinations were conducted by counsel appointed by the commissioner and by special counsel representing the State Board of Charities and the city department of charities respectively. The proceedings before Commissioner Strong attracted wide publicity in the press. Many sensational headings appeared from time to time in various newspapers purporting to report the testimony taken before the commission or the substance thereof which tended to show the existence of shocking conditions in some of the orphan asylums. The criticised institutions were by no means confined to those under Catholic control, and as a matter of fact the Protestant institutions thus criticised outnumbered the Catholic, although the aggregate number of children in these Catholic asylums was largely in excess of that of Protestant orphanages, as already pointed out.

It is undisputed that at least a few of the press articles and headlines referring to Catholic institutions falsely stated the testimony before the Strong commission. Notably, a newspaper headline, " Orphans and Pigs Fed from Same Bowl," following Commissioner Kingsbury's testimony to the effect that Mr. Doherty had described to him how the children in one of the Catholic institutions — the largest of all — " jumped up in military fashion at the end of the meal, picked up their pails and emptied them in the cans from which the soup or stew had been dished, and that the same can was later taken out to feed the pigs with." Mr. Doherty denied on the stand that he had ever stated to any one that children and pigs were fed out of the same dish. The actual fact respecting this incident was

that the uneaten portions of a meal were given to the pigs. It also appears that a reference to " Oliver Twist " made to some reporters by Mr. Doherty after one of the Strong hearings, resulted in a headline " Oliver Twist Outdone in Staten Island Home," a Catholic institution.

Coming now to the incidents which directly led up to the criminal acts here charged, it should be noted that the hearings before Commissioner Strong were coming to a close in February, 1916. On February sixteenth the defendant Farrell published in the New York papers what he termed an open letter to the Governor, which was subsequently published in pamphlet form, entitled " Public Scandal." On February twenty-fourth a leaflet was published, entitled " How the Strong Commission Has Discredited Itself." On March nineteenth a pamphlet entitled " Priest Baiting in 1916 " was issued. Copies of these various pamphlets to the number of some 700,000 were concededly published. The defendant Farrell avows the authorship of the pamphlets and, indeed, his name appears on each of them as the author. Monsignor Dunn admits that they were circulated through his efforts.

On or about February fourteenth, two days before the Farrell open letter to the Governor was published, one Moree, a social worker and publicity agent and assistant secretary of the State Charities Aid Association, met Commissioner Kingsbury and Mr. Doherty at the City Club, and suggested the idea of the publication of a pamphlet to be made up of various clippings of newspaper articles and editorials for the purpose, as he testified, of " overcoming much of the prejudice that was being created in the public mind by the newspaper statements that were appearing from various sources discrediting the Strong investigation." Mr. Moree had testified before Commissioner Strong that the purpose of his pamphlet, to use his own words, was " to meet entirely the unfair attack, as I considered, which was made by the Farrell pamphlet." Commissioner Kings-

bury had also testified to like effect before Commissioner Strong. As matter of fact neither of them had heard of the Farrell pamphlet until some time after the City Club talk. The Moree pamphlet was printed anonymously and distributed on or about February twenty-eighth and the money needed for this publication was secured by Mr. Kingsbury. A brief description of the pamphlet is proper in view of the defendants' contention that subsequent Farrell pamphlets were provoked by the anonymous Moree publication. It consists of twenty-four pages. On the first page appears the title: "Newspaper Comment on Governor Whitman's Charities Investigation Conducted by Charles H. Strong, Commissioner, appointed under the Moreland Act." On the same page and on nine other pages appear photographic reproductions of newspaper headlines, so arranged that parts of them overlap, but showing sufficient to indicate the striking features of each heading. Conspicuously printed on the first page one finds the headline "Orphans and Pigs Fed from Same Bowl" — "Kingsbury Attacks Sec. Hebberd." A few other typical headlines of the pamphlet may be cited as follows: "Admits Strapping His Orphan Charge;" "Oliver Twist Outdone in S. I. Home;" "Had One Tooth Brush for 400 Children;" "60 Spoons to 120 in Charity Home;" "Catholic Paper Defends Charity Institutions." In addition to the ten pages of newspaper headlines the pamphlet contains numerous editorial clippings. It may also be noted that the names of Messrs. Kingsbury and Doherty frequently appear in the articles and headlines.

It will now be in order to refer to the Farrell pamphlets. The first was the so-called open letter to the Governor, entitled "A Public Scandal," consisting of eleven pages. It purports to recite the incidents leading up to the creation of the Strong Commission, ridicules and sharply comments upon the witnesses who testified to the conditions which they claimed existed in various city institutions, and characterizes them as

agents of Mr. Kingsbury and as "muckrakers." The letter charges that the Strong Commission was the creature of a conspiracy to attack Catholic institutions, and that "in its course to date has made itself thoroughly distrusted, and the press reports almost daily disclose what appears as a lack of judicial impartiality as well as a nasty anti-Catholic animus." The letter concludes with an appeal to the Governor to terminate the commission and substitute in its stead a legislative committee which would make a complete investigation of the entire charity problem, including the societies pushing this " discredited investigation, as well as the department of public charities."

Subsequently to this letter, and following the Moree publication, successive pamphlets, to which reference has already been made, emanated from the pen of Father Farrell, assisted by Dr. Potter, and paid for and circulated by Monsignor Dunn. It would unduly lengthen this extended opinion to attempt to describe all the features of these pamphlets. It should suffice to state that the investigation is characterized as a " sham," " an injustice to children's institutions,". as " unfair." They assail Mr. Kingsbury's integrity and accuse him of having entered his office " determined to attack Catholic institutions," and in many ways hold him up to public ridicule and contempt. In one of the pamphlets Doherty is referred to as a tool of Kingsbury, " bound to do the will of his superior or lose his job," and Commissioner Strong is accused of receiving " hearsay " evidence and of misusing " the power conferred upon him by the Governor." The investigation of the State Board of Charities is described as " an attempt to injure and destroy the institutions in the interest of increasing the powers and employees of the department of charities and of again placing out children on the discredited baby farming system," and the Strong commission is denounced as " a slander factory." In the pamphlet entitled " Priest Baiting in 1916 " the Strong

commission is characterized as " an oligarchy " which " forced in the witness stand the defenders of children's institutions, baited by Strong, Clark and Hotchkiss," who were respectively the counsel to the commission and the city department of charities. In this pamphlet the authority of Mr. Strong, as commissioner, to subpœna the sponsors of the Farrell pamphlets is challenged and denied and the acts of the commission are asserted to constitute " bold and unscrupulous lawlessness, under the guise of exercising rightful powers," and are compared with the " acts of the Venetian Doges." The Moree pamphlet is described as a " scandalous anonymous pamphlet " instigated by Folks and Kingsbury, who " induced the Governor to appoint the Strong Commission," and who were influenced in the publication by " malice and hate."

After the appearance of the Moree and some of the Farrell pamphlets the special squad of the police department, whose duty it was to listen to conversations over the private telephones of persons suspected of crime, was detailed to overhear and record the conversations passing over the private telephone wires used by the defendants. Thereafter Commissioner Strong undertook what he regarded as an official investigation to ascertain the individuals who were responsible for the publication of various pamphlets. The defendants were summoned as witnesses before the commissioner and interrogated by the counsel of the commissioner and the department of charities. The police reports of the overheard telephone talks formed the basis of the questioning of these witnesses before Commissioner Strong. Father Farrell, one of the witnesses, refused to answer many questions, resting his refusal upon the lack of the commissioner's power to interrogate him concerning his own private acts.

The foregoing is, in my judgment, a sufficient résumé of the facts and circumstances leading up to the criminal charges laid against the defendants.

I shall now take up the consideration of these charges seriatim, commencing with the conspiracy charge. This charge was brought under subdivision 6 of section 580 of the Penal Law, which reads: "6. To commit any act * * * for the perversion or obstruction of justice, or of the due administration of the laws, each of them is guilty of a misdemeanor." The specifications alleged against the defendants are that they conspired to cause the defendant Potter to leave the State to avoid service of a subpœna and in various ways "conspired to impede, harass and defeat the performance of his duties by Commissioner Strong." Inducing or aiding one who may be required as a witness in a pending action to leave the jurisdiction of the court in order to escape the service of a subpœna or to evade such service doubtless would constitute the commission of an act "for the perversion or obstruction of justice." (Matter of Robinson, 140 App. Div. 329; People v. Chase & Coe, 16 Barb. 495.) The issuance of a subpœna is not a prerequisite to the establishment of this crime if the person charged knew that the person induced by him to evade service of a subpœna would be required as a witness. (State v. Keyes, 8 Vt. 57; Whart. Crim. Law [11th ed.], § 1597.) The proceeding before Commissioner Strong, however, was not a judicial one, and hence the defendants may not be deemed to have committed an act for the perversion or obstruction of justice.

But Commissioner Strong was performing an act which fairly comes within the "due administration of the laws," in that he was conducting a proceeding under a commission of the Governor, authorized by law, and which empowered him to subpœna and enforce the attendance of witnesses, etc. The question, however, arises whether the subpœnaing of Potter to inquire of him concerning the publication of alleged libelous pamphlets was within the scope of the commission. The powers of the commission were limited to the inquiry embraced within the provisions of the Moreland Act, under which *inter*

*alia* he was authorized to examine and investigate the management and affairs of the State Board of Charities. There can be no doubt that the commissioner was empowered to summon witnesses whose testimony might be material in shedding light upon questions affecting the integrity or efficiency of the members of the State Board of Charities or of its employees. It was also within his powers to examine into the conditions of the various orphan and other charitable institutions that were under the jurisdiction and within the visitorial powers of the State Board, with a view of ascertaining whether that body faithfully or competently discharged the duties intrusted to it. But when the commissioner sought to inquire into acts of private individuals deemed hostile to the investigation conducted by him, for the purpose of ascertaining whether they were responsible for alleged libelous publications, which were calculated to belittle or injuriously affect the work of the commission, a serious question arises whether such an inquiry transcended his powers as commissioner, which were purely statutory and strictly confined to the provisions of the statute. Thus, in Matter of Bradner (87 N. Y. 171), the supervisors of a county appointed a committee to ascertain certain facts concerning the railroad commissioners for North Danville. The statute conferred upon the board the power to subpœna witnesses " upon any subject within the jurisdiction of such board," etc. The respondent Bradner disregarded a subpœna of the board of supervisors that had been served upon him. An attachment which had been issued against him was granted. Says the court (p. 175) : " Now it is evident, with this question the supervisors have nothing to do ; it is, therefore, a matter not within their jurisdiction, and it follows that they had no authority to require the attendance of any witness to enable them to answer it, for however necessary or important they might deem his examination, it could only be enforced ' upon some subject or matter within the jurisdiction of such board '

(Laws of 1858, chap. 190, § 1). The subpœna, therefore, directed to the respondents conveyed no mandate which imposed compliance, and disobedience thereto was not within the meaning of the law contempt. Hence the attachment by which they were called upon to answer for it, issued without cause, and was, therefore, justly vacated."

In Matter of Union Bank (73 Misc. Rep. 404, 147 App. Div. 593, 204 N. Y. 313), the State Superintendent of Banks, who was investigating the affairs of the Union Bank, pursuant to the provisions of section 8 of the Banking Law, subpœnaed a former president of the bank to attend before him. The subpœna was disobeyed and a warrant of attachment against the person served was thereupon issued by the Supreme Court. A motion to vacate the warrant was denied at Special Term. On appeal to the Appellate Division by a three to two vote, the order denying the motion to vacate was affirmed. Upon appeal to the Court of Appeals the order was unanimously reversed. Three opinions were written. Without attempting here to analyze these opinions, it is sufficient to state that they held in effect that the superintendent had no power to inquire into conditions antecedent the time that he took possession of the bank, and that his powers of examination of witnesses were limited to such matters as the discovery of assets and their preservation and not to an inquiry which bore upon the circumstances under which the bank became insolvent. The same principle was recognized in Matter of Foster (68 Misc. Rep. 120, 139 App. Div. 769).

Interstate Commerce Commission v. Brimson (154 U. S. 447, 478, 479), is most instructive in this connection. The court in considering a case where an application had been made to the Circuit Court by the interstate commerce commission for an examination of certain parties says:

" We do not overlook these constitutional limitations which, for the protection of personal rights, must necessarily attend

all investigations conducted under the authority of Congress. Neither branch of the legislative department, still less any merely administrative body, established by Congress, possesses, or can be invested with, a general power of making inquiry into the private affairs of the city. (Kilbourn v. Thompson, 103 U. S. 168, 190.) We said in Boyd v. United States (116 U. S. 616, 630) — and it cannot be too often repeated — that the principles that embody the essence of constitutional liberty and security forbid all invasions on the part of the government and its employees of the sanctity of a man's home, and the privacies of his life. As said by Mr. Justice Field in In re Pacific Railway Commission (32 Fed. Rep. 241, 250), ' of all the rights of the citizen, few are of greater importance or more essential to his peace and happiness than the right of personal security, and that involves, not merely protection of his person from assault, but exemption of his private affairs, books, and papers from the inspection and scrutiny of others. Without the enjoyment of this right, all others would lose half their value.' " See also Matter of Barnes (204 N. Y. 108).

The weight of legal authority seems to me clearly to require the court to hold that the commissioner was without power to conduct the investigation, on account of which Potter and the other defendants were subpoenaed.

It seems to me too, that Potter as well as the other witnesses would have been within their rights to refuse to testify before the commissioner where the sole purpose of their examination was to ascertain the identity of the authors and instigators of the alleged libelous publications, upon the ground that, if the publications complained of constituted a criminal conspiracy, they could not be required to testify against themselves. An inquiry into crime may only be conducted through the legally constituted agencies, such as grand juries and judicial tribunals vested with power to uncover crimes and punish criminals. It may be pertinent, however, briefly to touch upon the evi-

dence adduced both in support and in defense of the charge of conspiracy, notwithstanding the legal conclusion which I have reached. The complainants largely relied upon the testimony of the officers who comprise the special detective squad charged with the duty of reporting telephonic conversations, for the purpose of detecting crime. A vast amount of testimony was taken before me probing the verity of the so-called phonograms. Testimony of alleged admissions or statements overheard by a person during a conversation is ordinarily not regarded as a high order of proof in the absence of corroboration, but most of the phonograms were corroborated by admission of the defendants themselves. The testimony of the police officers would justify a finding that they were faithfully discharging duties assigned to them by the police commissioner, and that their testimony was of a higher value than that of the ordinary witness, who may attempt to repeat a conversation in which he had no special interest. Allowance, of course, must be made for many errors, such as incorrect identification of the voices of those speaking, failure to grasp a name mentioned or the full meaning or scope of certain portions of the conversations; inability due to the condition of the telephone service clearly to appreciate all that was said; the misunderstanding or misapprehending the meaning of language used by men of superior education overheard by one of meagre education, and the inherent difficulties of correctly comprehending and transcribing the purport or substance of a rapidly spoken and lengthy telephone message. It also appeared that it was never contemplated by the police department to have the special telephone squad testify in court. These detectives were not ordinarily required to detail conversations, but to render reports sufficient to furnish clues of the whereabouts of suspected criminals or to acquaint the police department with anticipated acts of criminality. The identity of the members of this squad for prudential reasons was kept secret. It is also fair to assume

that men accustomed to a service such as that just described were not prepared to transcribe literally what a given person said over the telephone, and in justice to the officers it should be stated that they did not claim that their notes were literal transcripts of conversations. They took down what they deemed important and omitted what they regarded as unimportant. In most instances they gave merely their version or understanding of the substance of a conversation. But giving full effect to the testimony of the police officers, which, in the main, was not contradicted in its material and essential points, it falls far short of establishing a criminal conspiracy. The most that may be claimed is that the defendants, who were deeply interested in the work of the Strong commission, discussed from time to time ways and means for defeating a movement which they believed had been instituted to subvert the system of institutional charities, and sought to prevent their opponents, as they regarded them, from securing any information concerning themselves.

The evidence being insufficient in law and upon the facts to support an indictment for conspiracy, the information in that behalf must be dismissed.

We are now brought to the consideration of the three informations charging criminal libel. There is no doubt that the pamphlets complained of contained many statements which in a civil action would be regarded as matter of law libelous *per se*. But where, as here, the prosecution has not particularized words, sentences or paragraphs as libelous, the defendants are entitled to the application of the rule that the articles must be considered in their entirety and the meaning of any part construed in connection with the meaning of the entire publication. (Newell Sland. & Lib. [3d ed.], § 368.) It must also be borne in mind that to establish criminal libel a malicious intent must be shown. (People ex rel. Carvalho v. Warden, 144 App. Div. 24, 26 N. Y. Crim. 129; affd., 212

N. Y. 612.) Another important rule to be kept in view is that where public officials are under criticism the statute defining criminal libel must be narrowly construed against the accused. The defendants therefore are entitled to a strict construction of the statute in their favor. (People v. Cornell, 126 App. Div. 151.) It is the policy of our law, in consonance with the spirit of our institutions and our theory of government, whose cornerstone is the conservation of human liberty, to permit the widest latitude in the discussion of questions of political or public interest, including even attacks upon official acts and policies. Of course he who avails himself of these precious rights must toke heed lest in criticising such acts he wickedly or falsely assail the private character or personal integrity and honor of the official. For such wanton assaults he is amenable to him whom he may have libeled in damages or to a criminal conviction. (Bingham v. Gaynor, 203 N. Y. 27; Hamilton v. Eno, 81 id. 116; Triggs v. Sun Printing & Pub. Assn., 179 id. 144, 154.) The law seemingly has hedged the individual with many safeguards before he may be convicted of criminal libel in cases arising out of the discussion of matters of public interest.

The Constitution of the United States forbids the enactment of any law by Congress "respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press." The Constitution of the State of New York (art. I, § 8) provides as follows:

"Freedom of speech and press; criminal prosecutions for libel.— § 8. Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with

good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact."

Such is our fundamental law.   In a civil action for damages the jury is bound to follow the law as laid down by the court. In a criminal action for libel the jury has the right to determine "the law and the facts."   The law of libel in a civil action is not necessarily the law of criminal libel.   Section 1340 of the Penal Law defines a criminal libel as a "malicious publication."   In other words, malice is essential in a criminal libel, and in that respect is different from a libel in a civil action, in which it is not necessary to establish malice, nor is proof of the non-existence of malice any defense, excepting where the plea of qualified privilege in a matter of public interest is interposed by a defendant, as will be shown hereafter.   (Bingham v. Gaynor, 203 N. Y. 27, 30; Cady v. Brooklyn Union Pub. Co., 23 Misc. Rep. 409.)

Section 1342 reads as follows:

"Malice presumed; defense to prosecution.— A publication having the tendency or effect, mentioned in section thirteen hundred and forty, is to be deemed malicious, if no justification or excuse therefor is shown.

"The publication is justified when the matter charged as libelous is true, and was published with good motives and for justifiable ends.

"The publication is excused when it is honestly made, in the belief of its truth and upon reasonable grounds for this belief, and consists of fair comments upon the conduct of a person in respect of public affairs, or upon a thing which the proprietor thereof offers or explains to the public."

It would thus seem that where it is shown that the publication is "excused" malice must be affirmatively established by competent proof.

The only case that I can find that discusses the history of the enactment of section 1342 of the Penal Law (formerly 244 of the Penal Code) is People v. Sherlock (166 N. Y. 180), in which that able jurist, Judge CULLEN, wrote the opinion. The following excerpt therefrom is appropriate to this discussion: " By section 244 of the Penal Code, ' The publication is excused when it is honestly made, in the belief of its truth and upon reasonable grounds for this belief, and consists of fair comments upon the conduct of a person in respect of public affairs, or upon a thing which the proprietor thereof offers or explains to the public.' This provision seems to be entirely new, and I cannot find its history prior to the enactment of the Penal Code in 1881. It was not in the Code as it was reported by the codifiers in 1850. It does not deal with the cases of privileged communications, for they are covered by section 253, and it was always a good defense to a prosecution for libel that the communication was privileged. But whether a false charge is excusable or not under the Penal Code depends not only on the belief of the defendant and the grounds for such belief, but also on the subject-matter of the publication. It must consist ' of fair comments upon the conduct of a person in respect of public affairs, or upon a thing which the proprietor thereof offers or explains to the public.' The pecuniary honesty of Clark as foreman of a newspaper office was in no sense a public affair. It is not necessary for us to now enumerate the cases which would fall within this provision; it is sufficient to say that the one before us does not. The Constitution enacts that the truth of a publication, when made with good motives and for justifiable ends, shall be a defense. The legislative enactment goes a step further and provides that even if the publication is not true, if made in belief of its truth and upon reasonable grounds for that belief it shall also be a defense; but not in all cases; only in cases of the conduct of public affairs or of things offered to or explained to the public. As

this publication did not consist of such comments, belief in its truth did not tend to excuse the defendant."

The learned counsel for the prosecution, commenting upon the opinion just quoted, has argued that in view of the fact that the publication in that case did not relate to a matter affecting public affairs, it is to be regarded merely as a dictum and not a binding authority upon the construction of the provisions of section 1342, under which a publication may be excused. It is also contended by the prosecution that section 1342 was designed to incorporate into the Penal Law the defense of fair comment and criticism, based upon facts that exist and not upon statements that prove to be untrue.

In the discussion of the various defenses of privilege in Bingham v. Gaynor (203 N. Y. 27), the following observations of Judge CHASE, at page 30, are quite apropos: "A person on an occasion that rebuts any presumption of express malice may publish statements, although defamatory of the person referred to in the communication, if he does so in the performance of a legal or moral duty and in good faith, believing that such statements so made by him are true, without being liable for damages arising from such publication. The rule of law that permits such publications grew out of the desirability in the public interest of encouraging a full and fair statement by persons having a legal or moral duty to communicate their knowledge and information about a person in whom they have an interest to another who also has an interest in such person. Such privilege is known as a qualified privilege. It is qualified because it does not extend beyond such statements as the writer makes in the performance of such duty and in good faith believing them to be true."

Here we find a recognition of a complete defense even in a civil action for libel, although the words uttered are not true, where the occasion " rebuts any presumption of express malice," and arises in the performance of a legal or moral duty. What

is specially interesting is that the question of malice which ordinarily is not pertinent in the trial of a civil action for libel is held to be an essential element in the defense of a publication made in the performance of a moral or legal duty.

The provisions of the Penal Law seem to be plain excepting possibly that one which requires that the publication shall consist of "fair comments." An "excused" publication necessarily must be one founded upon an untrue statement, as otherwise it would come within the defense of "justification." The words "fair comments" in the statute therefore can only refer to those which may be deemed fair upon the false statements which the writer had reasonable grounds to believe to be true and which were made in the honest belief of their truth. What is meant by "fair comments?" Obviously the word "fair" is not to be restricted to the narrow meaning that it is justified or true. If the comment relate to some matter or thing, which has no reasonable connection with a public matter or official acts, it does not come within the meaning of "fair comment." Tested by the rules of law, is there reasonable ground for believing the defendants guilty of the crime of libel?

The publications in part, as heretofore observed, were unquestionably libelous *per se*. They related, however, to acts of persons engaged in the performance of a public duty. Many of the defamatory statements in the pamphlets were not justified so far as the evidence adduced upon the hearing shows. Such, for example, are the repeated charges of unfairness on the part of Commissioner Strong and of his anti-Catholic animus. The commissioner was not tied down to the strict rules of evidence required upon the trial of an action. The fact that he may have erred in assuming jurisdiction in his investigation of the authorship of the pamphlets is entirely consistent with a conscientious discharge of his duties as commissioner. If one may deduce therefrom a tyrannical exercise of power and a biased mind, then would every judge, however

painstaking and conscientious, be subject to similar criticism because of erroneous rulings upon a trial.

The evidence establishes that testimony was given upon the hearings before the commissioner asserting the existence of abuses and evil conditions in a considerable number of orphanages conducted by various religious denominations, and that other institutions managed by the same religious denominations were beyond reproach. The testimony of alleged institutional abuses and neglect of children was by no means limited to Catholic institutions. It may be that because of the largely preponderating number of children cared for in Catholic institutions adverse criticisms affecting the latter may have been brought more prominently before the community than those affecting other denominational institutions; but, be that as it may, there is not the slightest evidence that Commissioner Strong directly or indirectly was responsible for these newspaper publications. It is clear, therefore, that no defense of justification was established. But may the publications, nevertheless, be " excused ? "

The defendants Farrell and Dunn, and we are now only concerned with them, so far as the charges of criminal libel are concerned, occupy honored positions in the Catholic church; their reputations for probity have not been questioned; they were conspicuously and actively connected for many years in works of charity, including child-caring institutions; they are ardent advocates of the system of institutionalism in the task of caring for dependent children and are intense believers in the vital importance of institutionalism in the religious training of the child. The question of the State's adoption of the home or farming-out system of orphan children in place of the institutional system had been agitating the community for a considerable period of time, and the advocates of the respective systems on occasions lapsed from the spirit of calm deliberation into acrimonious charges involving religious, political and

personal motives. It was shown that certain persons promi-
nently identified with public charities had on occasions charged
the Catholic church with using its political power to prevent
any change in the State's policy towards the support of char-
itable institutions, and that some of these persons had actively
exerted themselves in securing the governor to institute a com-
mission to investigate the charges against the State Board of
Charities. For example, Mr. Devine, a well-known worker in
charitable undertakings, of high standing, gave testimony be-
fore Commissioner Strong, which was introduced in evidence
before me, as follows:

" I am prepared to say that the day of the private institutions
and reformatory and the day of the private hospital has gone
past forever, so far as their relation to the civic corporation is
concerned. I wish I could say that this is already true of New
York City. Unfortunately the figures of the last six years
show that we have not all proceeded in the right direction and
have increased our payments to private institutions, and I for
one say it is wrong. Why have we done it? It is because there
is in this city a well-organized Catholic interest whose power
and influence with the public officials is such that they dare not
deny them anything."

Reference has already been made to the fact that Charity
Commissioner Kingsbury, one of the prominent actors in the
Strong investigation, had actively participated in the publica-
tion of the anonymous Moree pamphlet, which had its inception
before the issuance of the Farrell " open letter to the governor."
It was also proved and not denied that Homer Folks, secretary
of the State Charities Aid Association, during a conversation
with the governor, in which the latter mentioned his intention
to designate a commission, had suggested Mr. Strong, among
other names, for appointment as commissioner. There can be
no doubt that the issuance of the subsequent Farrell pamphlets
was in great measure due to the Moree publication. The evi-

dent purpose of the Farrell pamphlets on the one hand was to arouse public sentiment against the Strong commission, and that of the Moree pamphlet to stimulate public antagonism against the system of child-caring institutions and to justify the action of those who had preferred charges against the State Board of Charities.

In so far as the information charged that Messrs. Kingsbury and Doherty were criminally libelled by the Farrell pamphlets, it seems clear that the prosecution has failed to establish a crime. They were themselves responsible for the circulation of the Moree pamphlet, which contained some statements against the Catholic institutions which were untruthful. The Farrell pamphlets may contain statements concerning them which were unwarranted, but considering that they were public officials, and that the objectionable utterances in the Farrell pamphlets related exclusively to comments concerning them in their official capacity in connection with the Strong commission, it seems to me that the publications as to them must be regarded as " excused " within the meaning of section 1342 of the Penal Law.

With respect to the charge that these publications constituted criminal libels against Commissioner Strong, a different situation exists. As already indicated, there was no proof submitted to me from which it may fairly be said that the commissioner did aught to subject him to the charges of tyranny and unfairness and of conducting the hearings before him with an anti-Catholic animus. It does not appear that the defendants proffered any evidence to refute the charges of abuse and ill-treatment which the commissioner declined to hear.

I have heretofore discussed what I deem to be the scope and purpose of the provisions of section 1342 of the Penal Law under which an otherwise libelous publication may be " excused." I may be pardoned if I here add to my observations as to the reasons which doubtless prompted the enactment of

the defense of an " excused " publication the opinions of judges of the highest eminence in English jurisprudence. In Wason v. Walter (4 Q. B. 73, 93), the distinguished Chief Justice Cockburn said: " Our law of libel has, in many respects, only gradually developed itself into anything like a satisfactory and settled form. The full liberty of public writers to comment on the conduct and motives of public men has only in very recent times been recognized. Comments on government, on ministers and officers of state, on members of both houses of parliament, on judges and other public functionaries, are now made every day, which half a century ago would have been the subject of actions or *ex officio* informations, and would have brought down fine and imprisonment on publishers and authors. Yet who can doubt that the public are gainers by the change, and that, though injustice may often be done, and though public men may often have to smart under the keen sense of wrong inflicted by hostile criticism, the nation profits by public opinion being thus freely brought to bear on the discharge of public duties? "

In Seymour v. Butterworth (3 F. & F. 372) the Lord Chief Justice, speaking of criticism of the press, said that " those who filled a public position must not be too thin-skinned in reference to comments made upon them. It would often happen that observations would be made upon public men which they knew from the bottom of their hearts were undeserved and unjust. Yet they must bear with them and submit to be misunderstood for a time, because all knew that the criticism of the press was the best security for the proper discharge of public duties."

The American authorities to the same effect are quite numerous. Duffy v. New York Evening Post Co. (109 App. Div. 471) is an illustration of the application of this rule by our Appellate Division.

In addition to the privileges accorded to him who discusses public affairs, it is not to be forgotten that a criminal prosecu-

tion for libel must fail unless the publication was inspired by malice and criminal intent. In considering whether the evidence would justify a finding of malice and criminal intent, one must take into account that the questions involved in the alleged libel touch upon religious issues. It is common knowledge that the average individual is very sensitive when he believes his religious views are assailed and that he will resent most strongly any attack upon his religious institutions. The evidence establishes that the defendants were inspired to publish the pamphlets in question by a feeling of duty to the Catholic church, of which they were conspicuous members, in order to defend their religious institutions against what they believed, whether rightly or wrongly, were wanton attacks upon them. It is no answer to say that had the defendants taken the trouble to read the minutes of the testimony before Commissioner Strong they could have ascertained that many of their statements were unfounded and unwarranted. There was no such legal obligation imposed upon them. Their acts must be judged by the same standards and tests that the law applies to the acts of others. A publication in a reputable newspaper is a common, even though it frequently happens, an erroneous and unsafe source upon which to formulate opinion on matters political, religious, social, personal or what not. To many a printed statement imports verity. It is due to this peculiar gullibility of individuals that advertising is said to pay. The test in a criminal libel is, Did the defendants honestly believe that these publications fairly represented what had transpired before the commission and was there reasonable ground for such belief? The evidence is that the defendants were influenced into believing the truthfulness of the newspaper and other reports, and there is no proof that the publication of the pamphlets was inspired by any personal grudge or spite or any motive ulterior to that which they believed affected the welfare of the institutions in which they were interested. With the added

benefit of the reasonable doubt to which those charged with crime are entitled, the conclusion is inevitable that the publications were not issued with malice or criminal intent, and hence the informations charging them with criminal libel must be dismissed.

There remains now the consideration of the charge of perjury against the defendant Hebberd.

Extracts from the testimony of Hebberd given before Commissioner Strong were read in evidence in the hearings before me. This testimony consists of his answers to numerous questions put to him relative to the occasions and times that he had met Potter shortly before March 16th, the number of telephone talks had with Potter and Farrell between March 16th and 29th, during which period the police squad overheard accusations on the tapped wire; what these conversations were and whether he did not give information to the other defendants as to what was taking place in the Strong investigation. The answers given by this defendant to these questions, when considered in connection with the testimony of the police officers on the same matters, presented issues of fact upon which a jury would be justified in finding that Hebberd willfully and knowingly testified falsely in the answers given by him before the commissioner. Were the testimony given by Hebberd material to any inquiry which Commissioner Strong was empowered to make it would be the clear duty of a committing magistrate to hold him for indictment by the grand jury. It is therefore incumbent upon me to consider the materiality of this testimony in view of section 1620 of the Penal Law, which defines perjury and expressly provides that it must appear that the person charged with this crime " willfully and knowingly " testified " falsely in any material manner " or stated " in his testimony * * * any material matter to be true which he knows to be false." The word " material " in the statute is not to be given a narrow meaning. It is not limited to testi-

mony directly bearing upon an issue, but to testimony that is elicited upon collateral questions. The test of materiality is whether the court, official tribunal or jury empowered to hear the testimony in a proceeding or trial may be influenced thereby in determining the matter under consideration. (People v. Moris, 155 App. Div. 711, 712; Chamberlain v. People, 23 N. Y. 85.)

All the questions propounded to Hebberd before Commissioner Strong were designed solely to bring out his connection with the Farrell.pamphlets and his participation with the other defendants in a conspiracy to obstruct the due administration of the laws. That this was the sole purpose of Hebberd's examination is apparent from the statement of Commissioner Strong himself, taken from the minutes of the proceedings before him, which were read in evidence before me, from which it appears that the commissioner, after intimating in a colloquy with Mr. Kingsbury's counsel, who had been questioning Hebberd, that the witness had been sufficiently interrogated about the telephone talks with the other defendants, stated as follows: " The patience with which the witness sustains an examination of this kind, knowing as he does that it is leading up to his connection between the pamphlet and himself, is all to his credit."

I have already held that the commissioner had no jurisdiction to examine witnesses respecting the relations of the defendants to the publication of the Farrell pamphlets. It would seem logically to follow from this ruling that the examination of Hebberd, during which his alleged perjurious testimony was given, was not material to the investigation which the commissioner was empowered to make, and therefore, under the Penal Law, the crime of perjury could not be established.

The information against Hebberd must be dismissed.

Ordered accordingly.