NARDONE ᴇᴛ ᴀʟ. *v.* UNITED STATES.

No. 190.   Argued November 15, 1937.—Decided December 20, 1937.

*Messrs. Louis Halle* and *Thomas O'Rourke Gallagher,* with whom *Mr. Joseph P. Nolan* was on the brief, for petitioners.

*Mr. William W. Barron,* with whom *Solicitor General Reed, Assistant Attorney General McMahon,* and *Messrs. John T. M. Reddan, W. Marvin Smith,* and *Bates Booth* were on the brief, for the United States.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The importance of the question involved,—whether, in view of the provisions of § 605 of the Communications Act of 1934,[1] evidence procured by a federal officer's tapping telephone wires and intercepting messages is admissible in a criminal trial in a United States District Court,—moved us to grant the writ of certiorari.

The indictment under which the petitioners were tried, convicted, and sentenced, charged, in separate counts, the smuggling of alcohol, possession and concealment of the smuggled alcohol, and conspiracy to smuggle and conceal it. Over the petitioners' objection and exception federal agents testified to the substance of petitioners' interstate communications overheard by the witnesses who had intercepted the messages by tapping telephone wires. The court below, though it found this evidence constituted such a vital part of the prosecution's proof that its admission, if erroneous, amounted to reversible error, held it was properly admitted and affirmed the judgment of conviction.[2]

Section 605 of the Federal Communications Act provides that no person who, as an employe, has to do with the sending or receiving of any interstate communication

---

[1] Ch. 652, 48 Stat. 1064, 1103; U. S. C. Tit. 47, § 605.

[2] 90 F. (2d) 630. See also *Smith* v. *United States,* 91 F. (2d) 556.

by wire shall divulge or publish it or its substance to anyone other than the addressee or his authorized representative or to authorized fellow employes, save in response to a subpoena issued by a court of competent jurisdiction or on demand of other lawful authority; and "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person; . . ." Section 501 [3] penalizes wilful and knowing violation by fine and imprisonment.

Taken at face value the phrase "no person" comprehends federal agents, and the ban on communication to "any person" bars testimony to the content of an intercepted message. Such an application of the section is supported by comparison of the clause concerning intercepted messages with that relating to those known to employes of the carrier. The former may not be divulged to any person, the latter may be divulged in answer to a lawful subpoena.

The government contends that Congress did not intend to prohibit tapping wires to procure evidence. It is said that this court, in *Olmstead* v. *United States,* 277 U. S. 438, held such evidence admissible at common law despite the fact that a state statute made wire-tapping a crime; and the argument proceeds that since the *Olmstead* decision departments of the federal government, with the knowledge of Congress, have, to a limited extent, permitted their agents to tap wires in aid of detection and conviction of criminals. It is shown that, in spite of its knowledge of the practice, Congress refrained from adopting legislation outlawing it, although bills, so providing, have been introduced. The Communications Act, so it is claimed, was passed only for the purpose of reën-

---

[3] Ch. 652, 48 Stat. 1064, 1100, U. S. C. Tit. 47, § 501.

acting the provisions of the Radio Act of 1927 [4] so as to make it applicable to wire messages and to transfer jurisdiction over radio and wire communications to the newly constituted Federal Communications Commission, and therefore the phraseology of the statute ought not to be construed as changing the practically identical provision on the subject which was a part of the Radio Act when the *Olmstead* case was decided.

We nevertheless face the fact that the plain words of § 605 forbid anyone, unless authorized by the sender, to intercept a telephone message, and direct in equally clear language that *"no person"* shall divulge or publish the message or its substance to *"any person."* To recite the contents of the message in testimony before a court is to divulge the message. The conclusion that the act forbids such testimony seems to us unshaken by the government's arguments.

True it is that after this court's decision in the *Olmstead* case Congressional committees investigated the wire-tapping activities of federal agents. Over a period of several years bills were introduced to prohibit the practice, all of which failed to pass. An Act of 1933 included a clause forbidding this method of procuring evidence of violations of the National Prohibition Act.[5] During 1932, 1933 and 1934, however, there was no discussion of the matter in Congress, and we are without contemporary legislative history relevant to the passage of the statute in question. It is also true that the committee reports in connection with the Federal Communications Act dwell upon the fact that the major purpose of the legislation was the transfer of jurisdiction over wire and radio communication to the newly constituted Federal Communications Commission. But these circumstances are,

---

[4] Act of Feb. 23, 1927, c. 169, 44 Stat. 1162.

[5] Department of Justice Appropriation Act of March 1, 1933, 47 Stat. 1381.

in our opinion, insufficient to overbear the plain mandate of the statute.

It is urged that a construction be given the section which would exclude federal agents since it is improbable Congress intended to hamper and impede the activities of the government in the detection and punishment of crime. The answer is that the question is one of policy. Congress may have thought it less important that some offenders should go unwhipped of justice than that officers should resort to methods deemed inconsistent with ethical standards and destructive of personal liberty. The same considerations may well have moved the Congress to adopt § 605 as evoked the guaranty against practices and procedures violative of privacy, embodied in the Fourth and Fifth Amendments of the Constitution.

The canon that the general words of a statute do not include the government or affect its rights unless the construction be clear and indisputable upon the text of the act does not aid the respondent. The cases in which it has been applied fall into two classes. The first is where an act, if not so limited, would deprive the sovereign of a recognized or established prerogative title or interest.[6] A classical instance is the exemption of the state from the operation of general statutes of limitation.[7] The rule of exclusion of the sovereign is less stringently applied where the operation of the law is upon the agents or servants of the government rather than on the sovereign itself.[8]

---

[6] *Dollar Savings Bank* v. *United States*, 19 Wall. 227, 239; *United States* v. *Herron*, 20 Wall. 251, 263; *United States* v. *American Bell Telephone Co.*, 159 U. S. 548, 554; *United States* v. *Stevenson*, 215 U. S. 190, 197; *Title Guaranty & Surety Co.* v. *Guarantee Title & Trust Co.*, 174 Fed. 385, 388; Maxwell, Interpretation of Statutes (7th ed.) 117, 121; Black on Interpretation of Laws (2d ed.) 94.

[7] *United States* v. *Hoar*, 2 Mason 311, 314–315.

[8] "The prohibitions [against any form of action except that specified in the statute] if any, either express or implied . . . are for others,

The second class,—that where public officers are impliedly excluded from language embracing all persons,— is where a reading which would include such officers would work obvious absurdity as, for example, the application of a speed law to a policeman pursuing a criminal or the driver of a fire engine responding to an alarm.[9]

For years controversy has raged with respect to the morality of the practice of wire-tapping by officers to obtain evidence. It has been the view of many that the practice involves a grave wrong. In the light of these circumstances we think another well recognized principle leads to the application of the statute as it is written so as to include within its sweep federal officers as well as others. That principle is that the sovereign is embraced by general words of a statute intended to prevent injury and wrong.[10]

not for the government. They may be obligatory on tax collectors. They may prevent any suit at law by such officers or agents." *Dollar Savings Bank* v. *United States*, 19 Wall. 227, 239. "These provisions unmistakably disclose definite intention on the part of Congress effectively to safeguard rivers and other navigable waters against the unauthorized erection therein of dams or other structures for any purpose whatsoever. The plaintiff maintains that the restrictions so imposed apply only to work undertaken by private parties. But no such intention is expressed, and we are of opinion that none is implied. The measures adopted for the enforcement of the prescribed rule are in general terms and purport to be applicable to all. No valid reason has been or can be suggested why they should apply to private persons and not to federal and state officers. There is no presumption that regulatory and disciplinary measures do not extend to such officers. Taken at face value the language indicates the purpose of Congress to govern conduct of its own officers and employees as well as that of others." *United States* v. *Arizona*, 295 U. S. 174, 184. Compare *Stanley* v. *Schwalby*, 147 U. S. 508, 515; *Donnelley* v. *United States*, 276 U. S. 505, 511.

[9] *Balthasar* v. *Pacific Electric Ry. Co.*, 187 Cal. 302; 202 Pac. 37; *State* v. *Gorham*, 110 Wash. 330; 188 Pac. 457.

[10] *United States* v. *Knight*, 14 Pet. 301, 315; *United States* v. *Herron*, 20 Wall. 251, 263; Black on Interpretation of Laws (2d ed.) 97.

The judgment must be reversed and the cause remanded to the District Court for further proceedings in conformity with this opinion.

*Reversed.*

Mr. Justice Sutherland, dissenting.

I think the word "person" used in this statute does not include an officer of the federal government, actually engaged in the detection of crime and the enforcement of the criminal statutes of the United States, who has good reason to believe that a telephone is being, or is about to be, used as an aid to the commission or concealment of a crime. The decision just made will necessarily have the effect of enabling the most depraved criminals to further their criminal plans over the telephone, in the secure knowledge that even if these plans involve kidnapping and murder, their telephone conversations can never be intercepted by officers of the law and revealed in court. If Congress thus intended to tie the hands of the government in its effort to protect the people against lawlessness of the most serious character, it would have said so in a more definite way than by the use of the ambiguous word "person." *Commonwealth* v. *Welosky,* 276 Mass. 398, 403–404, 406; 177 N. E. 656. For that word has sometimes been construed to include the government and its officials, and sometimes not. I am not aware of any case where it has been given that inclusive effect in a situation such as we have here. Obviously, the situation dealt with in *United States* v. *Arizona,* 295 U. S. 174, was quite different. There, a federal statute forbade the construction of any bridge, etc., in any port, etc., "until the consent of Congress . . . shall have been obtained." The mere building of the designated structure, in the absence of congressional consent, violated the statute. There was no ambiguous term, such as we have here, or anything else in the language, requiring construction.

There is a manifest difference between the case of a private individual who intercepts a message from motives of curiosity or to further personal ends, and that of a responsible official engaged in the governmental duty of uncovering crime and bringing criminals to justice. It is fair to conclude that the word "person" as here used was intended to include the former but not the latter. This accords with the well-settled general rule stated by Justice Story in *United States* v. *Hoar,* 2 Mason 311, 314–315; 26 Fed. Cas. 329, 330: "In general, acts of the legislature are meant to regulate and direct the acts and rights of citizens; and in most cases the reasoning applicable to them applies with very different, and often contrary force to the government itself. It appears to me, therefore, to be a safe rule founded in the principles of the common law, that the general words of a statute ought not to include the government, or affect its rights, unless that construction be clear and indisputable upon the text of the act." And see *In the Matter of Will of Fox,* 52 N. Y. 530, 535. Compare *State* v. *Gorham,* 110 Wash. 330; 188 Pac. 457; *Balthasar* v. *Pacific Electric Ry. Co.,* 187 Cal. 302, 305–308; 202 Pac. 37. A case in point is that of *People* v. *Hebberd* (Sup. Ct. N. Y.), 96 Misc. 617, 620–621; 162 N. Y. S. 80.

In the investigations of the congressional committees, referred to in the opinion of the court, it appeared that the Attorney General had ordered that no tapping of wires should be permitted without the personal direction of the chief of the bureau, after consultation with the Assistant Attorney General in charge of the case; and that such means were to be adopted only as an emergency method. The Attorney General himself appeared before one of the committees and pointed out that crime had become highly organized, with strong political connections and illegal methods of procedure; that gangsters and desperate criminals had equipped themselves with every

modern convenience and invention; that modern gangsters have no regard for life, property, decency or anything else; and he had no doubt that they tapped wires leading to offices of the United States attorneys to find out what was being done. He cited the case of a Bureau of Investigation agent who had been found shot to death under circumstances which indicated that a gang of narcotic traffickers had murdered him; and he posed the question whether, if it had appeared that the perpetrators of the crime could be detected and brought to justice by tapping their telephone wires, nevertheless, that ought not to be done.

The answer of Congress to the question has been a refusal to pass any of the bills which comprehensively proposed to forbid the practice.

My abhorrence of the odious practices of the town gossip, the Peeping Tom, and the private eavesdropper is quite as strong as that of any of my brethren. But to put the sworn officers of the law, engaged in the detection and apprehension of organized gangs of criminals, in the same category, is to lose all sense of proportion. In view of the safeguards against abuse of power furnished by the order of the Attorney General, and in the light of the deadly conflict constantly being waged between the forces of law and order and the desperate criminals who infest the land, we well may pause to consider whether the application of the rule which forbids an invasion of the privacy of telephone communications is not being carried in the present case to a point where the necessity of public protection against crime is being submerged by an overflow of sentimentality.

I think the judgment below should be affirmed.

MR. JUSTICE McREYNOLDS joins in this opinion.