## UNITED STATES v. NARDONE et al.
### No. 412.

Circuit Court of Appeals, Second Circuit.
July 20, 1939.

Writ of Certiorari Granted Oct. 9, 1939.

See 60 S.Ct. 103, 84 L.Ed. ——.

42

David V. Cahill, of New York City, for Frank Carmine Nardone.

Wegman & Climenko, of New York City (Jesse Climenko and Eugene J. Davidson, both of New York City, of counsel), for appellant Hoffman.

Louis Halle, of New York City, for Robert Gottfried.

John T. Cahill, U. S. Atty., of New York City (Lester C. Dunigan and Maxwell S. McKnight, Asst. U. S. Attys., both of New York City, of counsel), for the United States.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The accused appeal from a judgment convicting them under an indictment in three counts two for smuggling and concealing alcohol, and a third for a conspiracy to do so. We affirmed an earlier conviction under the same indictment (United States v. Nardone, 2 Cir., 90 F.2d 630), but the Supreme Court reversed our judgment (Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314) because of the admission of certain telephone "taps" which we thought competent, but they did not. Upon the present trial the same transactions were proved by what, generally speaking, was the same evidence, omitting the "taps"; and the main question raised by these appeals is whether the judge improperly refused to allow the accused to examine the prosecution as to the uses to which it had put the information unlawfully gained; that is, as to what part of the evidence introduced was indirectly procured as a result of tapping the wires. We may refer to the statement of facts in our first opinion to show the general character of the crime charged and proved, and before discussing the main issue, we will take up some of the incidental objections raised. Nardone says that there was no evidence against him except the declarations of other parties to the venture, which did not become competent until he had been independently connected. The principle is right, but its application is wrong. The prosecution directly proved that he was habitually in the company of those conspirators who were openly connected with the smuggling; and Geiger, a radio operator, swore that at the interview at which LeVeque, one of the conceded smugglers, was giving him his instructions, both Nardone and Hoffman were present; they would not have been, had they been merely disinterested observers. Another witness, McAdam, said that LeVeque introduced Nardone to him as his partner, and that the project was freely discussed before him. Apparently Nardone was one of the ringleaders. Gottfried also was repeatedly in the company of the smugglers at their customary places of meeting. His guilt was clearly enough shown by his ef-

fort to destroy incriminating papers at the time of his arrest. He went to a water-closet off the bar where the arrests took place and threw into the flush-tank among other papers, the business cards of one, Mathiasen, and one Callahan. The reason for supposing that these came from Gottfried rather than from Nardone, who had earlier gone into the same water-closet, is that one, Mathiasen, swore that Gottfried had arranged with him to have Callahan, the owner of the Southern Sword, board that ship when she entered New York Harbor, loaded with alcohol on March 17, 1936, the date of the smuggling in the substantive counts. It is reasonable to conclude that these papers at least he tried to conceal, even if it was Nardone who threw away those relating to the places where the Isabelle H. and the Southern Sword were to meet in southern waters. Hoffman's connection was also sufficiently established. He had paid for the gasoline to run the trucks that took the alcohol from the Pronton in December 1934 or January 1935, and he too was repeatedly seen in the company of the others. He objects that the conspiracy was laid as commencing on January 2, 1935, and that it was not shown that he paid for the gasoline after it began. That is irrelevant; his earlier complicity might not have been enough, had it not been followed by his later association with the smugglers; but when that was proved, it was reasonable to infer that it was in continuation of the original course of dealing, which took its color from what had gone before. There was plainly enough to support a verdict against all these men—certainly as to the conspiracy.

Objection was taken to the admission of several bits of testimony other than that procured by the "taps". The prosecution was allowed to prove the landing at Keansburg, New Jersey, of some alcohol from the Pronto, which was interrupted by Treasury agents while it was in progress, and which developed into a shooting affray. This was altogether competent as in execution of the conspiracy. Several of the principal smugglers had been present at the scene and on the next day LeVeque was excitedly discussing it in the restaurant, where he had met several of the others, among them Nardone. The objection appears to be based upon the notion that the evidence was incompetent because it was likely to divert the jury's mind from the crime to one of its distracting incidents.

That is often true, but is never a reason for refusing to admit anything that goes to prove the issues.

The next objection was to secondary testimony by a sailor, Murphy, of a paper purporting to be a list of the owners of the Isabelle H. which contained the name of Nardone. Murphy, who was one of the crew of that vessel, swore that the wireless operator on board showed it to him in answer to his request for the names of those who were to pay him. If this had been mere gossip between the two men, it would not have been admissible; the fact that one conspirator tells another something relevant to the conspiracy does not alone make the declaration competent; the declaration must itself be an act in furtherance of the common object; mere conversation between conspirators is not that, any more than the declaration of an agent outside the scope of his duties. Here, however, the declaration of the wireless operator was probably a part of his duty; for he was employed to keep in touch with the owners ashore and advise them of any troubles that might arise. Ordinarily it is true, only the master would be authorized to answer the sailor's question, but, considering the peculiar position of wireless operators on rum-runners, as Murphy swore to it, the situation was exceptional. The point is not free from doubt, but in any case no great harm is done by the testimony, as Nardone was amply connected without it.

There is left only the question of the effect of the unlawful "taps". Did they taint all other evidence procured through them? Watson v. United States, 3 Cir., 6 F.2d 870. Did the burden rest upon the accused or the prosecution, to show to what the taint extended? United States v. Kraus, D.C., 270 F. 578, 581. How should the inquiry be conducted? Was it too late to leave it until the trial? We do not think we need answer these questions because of the decision in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376, which, so far as we can see, still stands. The doctrine of that case is that telephone tapping is not of itself an unlawful search under the Fourth Amendment. If it were, then perhaps not only the actual talk overheard would be incompetent, but any evidence obtained by means of it; the court did not say as to that. In any case the same consequence does not attend the acquisition of

evidence by means of an ordinary crime; as to that, the common-law still prevails, and the court will not look beyond the character of the evidence itself. In Nardone v. United States, supra, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314, the Supreme Court decided only that the Federal Communications Act, 47 U.S.C.A. § 151 et seq., forbad divulging information derived from telephone "taps" in a court of law by government employees; all the discussion ranged upon whether the language of the act covered them. If it did, their testimony had been forbidden, and was of course incompetent; Congress had made it so. But Congress had not also made incompetent testimony which had become accessible by the use of unlawful "taps", for to divulge that information was not to divulge an intercepted telephone talk. Indeed, the officer might lock what he had heard in his breast, and yet use it effectively enough. He would of course be taking advantage of his crime, but that would not be enough; the testimony he secured would not itself be a forbidden disclosure. So understood, the two cases are consistent, and the accused at bar had no right to a discovery of how the prosecution's case was prepared.

On the other hand, if Olmstead v. United States, supra, should be treated as overruled the convictions may well have to be reversed. There is no practical way in which an accused can avail himself of his privilege—if it extends beyond the telephone talk itself—than by a complete discovery of how the case against him has been prepared. In substance the judge stopped the inquiry, for it did not help to give leave to the accused, as he did, to examine as to any specific evidence they could point out. Evidence does not bear the ear-marks of its acquisition. One thing leads to another, and if the original taint pervades the last scrap of evidence eventually found, the accused will not get his rights short of a complete disclosure. We hesitate to assume that so drastic a remedy follows upon a single misstep. If the inquiry must precede the trial, the prosecution will often be hopelessly handicapped by a complete exposure of its case in advance. On the other hand, if it is left to the conclusion of the testimony, a mistrial will be necessary unless it turns out that the prosecution has not used the "taps" at all, or so little as not to count. These embarrassments may well result in qualifying the doctrine that all evidence procured through any unlawful search is incompetent; the incompetence may be limited to the very transaction—the document seized, the talk overheard. That, for example, is the doctrine as to confessions. Wigmore, § 859. The Supreme Court has never committed itself on the point, for in all its decisions except Silverthorne Lumber Company v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, the very document or other evidence seized was offered; and in that case, although the unlawfully seized papers were not offered, the prosecution was proposing to compel their production.

From what we have said it is apparent that we think that the result here is doubtful. Possibly Olmstead v. United States, supra, is no longer law; if it is not, possibly the extreme form of the doctrine will prevail, even at the cost of those difficulties in the prosecution of crime which we have mentioned. Against this chance we think that the accused should be allowed bail, pending application for certiorari. When we denied bail originally, we had not had the chance to examine the record or to appreciate the doubts which have now appeared.

Judgment affirmed: appellants admitted to bail in case they apply for certiorari within ten days after this opinion is filed.