# Wiretapping by Members of the
# Naval Intelligence Service

In this letter, Attorney General Jackson advises the Secretary of the Navy not to approve and adopt the position taken by the Judge Advocate General of the Navy that records may legally be made of private communications sent or received by use of telephone facilities controlled by the Navy, with a view to the use of such records in prosecutions involving espionage, sabotage, and subversive activities.

June 9, 1941

LETTER FOR THE SECRETARY OF THE NAVY

Reference is made to the letter of Acting Secretary Forrestal, of May 28, transmitting to me a copy of a confidential opinion of the Judge Advocate General of the Navy, of May 24, 1941, on the subject "Wiretapping by Members of Naval Intelligence Service." The Judge Advocate General makes certain suggestions respecting methods and means whereby he believes that records may legally be made of private communications sent or received by use of telephone facilities controlled by the Navy, with a view to the use of such records in prosecutions involving espionage, sabotage, and subversive activities. My comment and advice are requested regarding these suggestions.

In view of the decisions of the Supreme Court and of other courts, discussed at length in the enclosed memorandum prepared in this Department, I am unable to advise that the suggestions be approved and adopted by you.

ROBERT H. JACKSON
*Attorney General*

June 7, 1941

MEMORANDUM FOR THE ASSISTANT SOLICITOR GENERAL

The question raised by the Secretary of the Navy is whether, despite section 605 of the Communications Act of 1934,[1] the commandant or commanding officer of any naval station or establishment has authority to tap telephones within the confines of his station for the purpose of obtaining information regarding espionage, sabotage and subversive activities; and also whether, if such conduct is not lawful, information obtained from such wiretapping can be admitted as evidence in criminal trials of civilian employees and non-employees.

The relative portion of section 605 of the Communications Act of 1934 reads as follows:

> [A]nd no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person . . . .

47 U.S.C. § 605 (1940).

Section 605 has been discussed in three decisions of the Supreme Court and in a number of lower federal court decisions. The answer to the Secretary's question requires a brief consideration of these cases.

The first case reaching the Supreme Court was *Nardone v. United States*, 302 U.S. 379 (1937) ("*Nardone I*"). The question involved was whether evidence procured through the tapping of telephone wires by federal officers was admissible in a criminal trial in a United States district court. The Court held that the tapping of telephone wires by a federal officer was a violation of section 605 and that the evidence so obtained was inadmissible.[*] Justice Roberts, speaking for the majority, stated:

---

[1] Pub. L. No. 73-416, § 605, 48 Stat. 1064, 1103–04 (codified at 47 U.S.C. § 605 (1940)).

[*] Editor's Note: Decisions of the Supreme Court after *Nardone I* appeared to regard it as an open question whether section 605 prohibited the mere interception of wire communications. *See, e.g.*, *Rathbun v. United States*, 355 U.S. 107, 108 n.3 (1957); *Benanti v. United States*, 355 U.S. 96, 100 n.5 (1957). With the exception of a three-month period during 1940, when Attorney General Robert Jackson "prohibited all wiretapping by the Federal Bureau of Investigation," Final Report of the Select Committee to Study Governmental Operations with Respect to Intelligence Activities, S. Rep. No. 94-755, bk. III, 279 (1976) ("Church Comm. Rep."), the Department interpreted section 605 as not "prohibiting the interception of wire communications *per se*, [but] only the interception and divulgence of their contents outside the federal establishment." *Id.* at 278; *accord Interception of Radio Communication*, 3 Op. O.L.C. 240, 245 (1979). This approach was consistent with President Roosevelt's directive to Attorney General Jackson on the use of wiretaps, *see* Church Comm. Rep. at 279 (quoting a memorandum from the President to the Attorney General, dated May 21, 1940), and statements to Congress by Attorneys General Jackson and Biddle, *see id.* at 280–81; *Authorizing Wire Tapping in the Prosecution of the War: Hearings on H.J. Res. 283 Before the H. Comm. on the Judiciary*, 77th Cong. 2 (1942).

> Taken at face value the phrase "no person" comprehends federal agents, and the ban on communication to "any person" bars testimony to the content of an intercepted message. Such an application of the section is supported by comparison of the clause concerning intercepted messages with that relating to those known to employees of the carrier. The former may not be divulged to any person, the latter may be divulged in answer to a lawful subpoena.

302 U.S. at 381.

In answer to the government's contention that the legislative history of section 605 showed no intention on the part of Congress that wiretapping by federal officers be prohibited, Justice Roberts stated:

> We nevertheless face the fact that the plain words of § 605 forbid anyone, unless authorized by the sender, to intercept a telephone message, and direct in equally clear language that "*no person*" shall divulge or publish the message or its substance to "*any person*." To recite the contents of the message in testimony before a court is to divulge the message. The conclusion that the act forbids such testimony seems to us unshaken by the government's arguments.

*Id.* at 382.

> It is urged that a construction be given the section which would exclude federal agents since it is improbable Congress intended to hamper and impede the activities of the government in the detection and punishment of crime. The answer is that the question is one of policy. Congress may have thought it less important that some offenders should go unwhipped of justice than that officers should resort to methods deemed inconsistent with ethical standards and destructive of personal liberty. The same considerations may well have moved the Congress to adopt § 605 as evoked the guaranty against practices and procedure violative of privacy, embodied in the Fourth and Fifth Amendments of the Constitution.

*Id.* at 383.

Justices Sutherland and McReynolds dissented on the ground that the word person, as used in the Act, did not apply to federal officers and that Congress had not intended to tie the hands of government enforcement agencies by such restrictions. *Id.* at 385.

The *Nardone* case came back to the Supreme Court two years later. *Nardone v. United States*, 308 U.S. 338 (1939) ("*Nardone II*"). This time the issue was whether section 605 not only forbade the introduction of evidence obtained directly by wiretapping, but also prohibited the admission of evidence procured

through the use of knowledge derived from the wiretapping. The Court upheld the latter interpretation. Reversing the court below, Justice Frankfurter, speaking for the majority, stated:

> We are here dealing with specific prohibition of particular methods in obtaining evidence. The result of the holding below is to reduce the scope of § 605 to exclusion of the exact words heard through forbidden interceptions, allowing these interceptions every derivative use that they may serve. Such a reading of § 605 would largely stultify the policy which compelled our decision in [*Nardone I*]. That decision was not the product of a merely meticulous reading of technical language. It was the translation into practicality of broad considerations of morality and public well-being. This Court found that the logically relevant proof which Congress had outlawed, it outlawed because "inconsistent with ethical standards and destructive of personal liberty." [302 U.S. at 383.] To forbid the direct use of methods thus characterized but to put no curb on their full indirect use would only invite the very methods deemed "inconsistent with ethical standards and destructive of personal liberty." What was said in a different context in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 [(1920)], is pertinent here: "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all." *See Gouled v. United States*, 255 U.S. 298, 307 [(1921)]. A decent respect for the policy of Congress must save us from imputing to it a self-defeating, if not dangerous purpose.

*Id.* at 340–41.

Justice McReynolds dissented without opinion. Justice Reed did not participate. *Id.* at 343.

The third case decided by the Supreme Court is *Weiss v. United States*, 308 U.S. 321 (1939). Here the issue was whether section 605 applied to the interception, not only of interstate communications, but also of intrastate communications. The Court held that the Congress had the power to, and intended to, prohibit interception of both interstate and intrastate communications. Justice Roberts, writing for a unanimous Court, stated:

> Plainly the interdiction thus pronounced is not limited to interstate and foreign communications. And, as Congress has power, when necessary for the protection of interstate commerce, to regulate intrastate transactions, there is no constitutional requirement that the scope of the statute be limited so as to exclude intrastate communications.

. . . .

> We hold that the broad and inclusive language of the second clause
> of the section is not to be limited by construction so as to exclude in-
> trastate communications from the protection against interception and
> divulgence.

*Id.* at 327, 329 (footnote omitted).

The government likewise made the claim in the *Weiss* case that the disclosure of the intercepted communications was "authorized by the sender" and therefore admissible. It appeared that certain of the defendants, upon being told that their conversations had been intercepted, turned state's evidence and testified to the conversations. The Court rejected the government's contention, pointing out that the conversations had been intercepted before consent was given and that, in any event, the consent was not voluntary but "enforced":

> Statement of these facts is convincing that the so-called authoriza-
> tion consisting of the agreement to turn state's evidence, by some of
> the defendants after they had been apprized of the knowledge of their
> communications by the Government's representatives, and in the
> hope of leniency, was not that intended or described by the statute
> and emphasi[ze] the offensive use which may be made of intercepted
> messages, whether interstate or intrastate. It is not too much to as-
> sume the interdiction of the statute was intended to prevent such a
> method of procuring testimony.

308 U.S. at 330–31.

There have been a number of decisions on section 605 by the lower federal courts, but only three cases have any direct bearing on the issue here. In *United States v. Polakoff*, 112 F.2d 888 (2d Cir. 1940),[*] it appeared that the defendants had approached one Kafton, who was under indictment, and offered to procure a light sentence for him if Kafton would pay them a sum of money. Kafton reported this to the District Attorney, who sent him to the FBI. Through a telephone in the FBI office, Kafton talked with the defendants, and the conversations were recorded on a machine fixed to an extension of the telephone that Kafton was using. Subsequently, the defendants were tried and convicted for the conspiracy to obstruct justice, and the question on appeal was whether or not the telephone conversations had been properly admitted. The government argued that the conversations were admissible because Krafton was the "sender" and had given his

---

[*] Editor's Note: *Polakoff* was later overruled by *Rathbun v. United States*, 355 U.S. 107 (1957). The Court in *Rathbun* held that it did not constitute an "interception" under section 605 for law enforcement, with consent from one party, to employ a regularly-used telephone extension to listen in on a conversation. *Id.* at 107–11.

consent to the recording, and because, in any event, the message had not been "intercepted." The court rejected both contentions and held the conversations inadmissible. On the first point, the court ruled that in a telephone conversation each party must be deemed the "sender" within the meaning of section 605, and, therefore, both must give consent to the interception. As to the second point, Judge Learned Hand stated:

> Moreover, the recording was an "interception." It is true that in the three decisions in which the Supreme Court has interpreted [section] 605, . . . the prosecuting agents had physically interposed some mechanism in the circuit as it had been constructed for normal use; at least that is what we understand by a "tap." That was not the case here; the recording machine was merely fixed to an existing "extension" of the familiar kind in an adjoining room. We assume that the situation would have been no different, had the agent merely listened at the extension, and taken down what he heard by shorthand. The statute does not speak of physical interruptions of the circuit, or of "taps"; it speaks of "interceptions" and anyone intercepts a message to whose intervention as a listener the communicants do not consent; the means he employs can have no importance; it is the breach of privacy that counts. We need not say that a man may never make a record of what he hears on the telephone by having someone else listen at an extension, or, as in the case at bar, even by allowing him to interpose a recording machine. The receiver may certainly himself broadcast the message as he pleases, and the sender will often give consent, express or implied, to the interposition of a listener. Party lines are a good illustration; and it would be unwise to try in advance to mark the borders of such implications. Here, however, we need not be troubled by niceties, because, no matter what the scope of any such implied consent, it cannot extend to the intervention of prosecuting agents bent upon trapping the "sender" criminally. Violation of the privilege, we are admonished, is so grave a dereliction as to be "destructive of personal liberty" [(*Nardone I*, 302 U.S. at 383)] and if it is not to be sham and illusion, it must protect its possessor at least against such intrusions. "A decent respect for the policy of Congress must save us from imputing to it a self-defeating, if not disingenuous purpose." [*Nardone II*, 308 U.S. at 341.] *United States v. Yee Ping Jong*, [26 F. Supp. 69 (W.D. Pa. 1939)], is to the contrary, but does not persuade us.

*Id.* at 889–90.

Judge Augustus Hand concurred. *Id.* at 890. Judge Clark dissented in a long opinion, saying:

> There can be no real distinction—there is none suggested in the stat-
> ute or by common sense—between these recordings and a transcrip-
> tion made by a private secretary over the telephone in an outer office,
> or by a servant on an upstairs extension in a house, or even by a per-
> son listening at the telephone receiver held by the party to the con-
> versation. Nor can it be of importance whether the transcriber or the
> party first makes the suggestion for the recording; in either event it is
> the party who has the power to direct or prohibit its transcription.
> Neither is it important whether evidence of the conversation comes
> from the mechanical device of a record or from testimony of those
> directed to listen in, except that the mechanical device gives the more
> trustworthy evidence. Indeed, in the Fallon case the agents them-
> selves testified as to what they had overheard, testimony which must
> be considered objectionable under the decision here.

*Id.* at 891.

In a companion case, the court ruled the same way in a situation where the conversations had been intercepted by the installation of the recording device in the house of the chief witness and with his consent. *United States v. Fallon*, 112 F.2d 894 (2d Cir. 1940) (per curiam).

In *United States v. Yee Ping Jong*, 26 F. Supp. 69 (W.D. Pa. 1939), a federal district court reached a somewhat different conclusion from the Second Circuit in the *Polakoff* case. In the *Yee Ping Jong* case, federal agents employed one Loui Wong as an informer and an interpreter, and at the direction of the agent Loui, Wong called the defendant on the telephone from a house belonging to an associate of the agent. A recording of the conversation was made by a device attached to an extension of the "phone." The court held the intercepted conversa-tion admissible on the ground that the recording did not constitute an "intercep-tion" within the meaning of the statute, saying:

> The call to the defendant was made by Agent White, and the conver-
> sation between his interpreter and the defendant was not obtained by
> a "tapping of the wire" between the locality of call and the locality of
> answer by an unauthorized person, but was, in effect, a mere record-
> ing of the conversation at one end of the line by one of the partici-
> pants. It differed only in the method of recording from a transcription
> of a telephone conversation made by a participant. We are of opinion
> that the admission of the record in evidence was not error.

*Id.* at 70.

In the *Polakoff* case, Judge Learned Hand stated that the *Yee Ping Jong* case was inconsistent with the majority decision and refused to follow it. 112 F.2d at 890. It should be noted, however, that the *Yee Ping Jong* case might be distin-

guished from the *Polakoff* case on the ground that Loui Wong acted merely as interpreter for the federal agent, rather than on his own initiative.

There is nothing in the history of section 605 which throws any light on the issue here presented. Indeed, it is not clear from the legislative history that Congress intended section 605 to prohibit wiretapping by government officers at all. That issue, however, is, of course, settled otherwise by the Supreme Court decisions, just mentioned.

Viewed in the light of the foregoing decisions, it seems to me rather clear that section 605 prohibits the tapping of telephone wires even within the confines of a government building. As the Supreme Court pointed out in the first *Nardone* case, that statute provides that "no person" shall intercept any communication and divulge it to "any person." Certainly the interception of calls by a member of the Naval Intelligence Service and the divulging of the contents thereof to a superior would fall within the literal terms of the statute. Neither the fact that one of the parties to the call was an employee of the Navy Department, nor the fact that the call was made to or from a government building, would seem to afford the interception immunity from the precise terms of the act. Nor would an authorization of the interception by the government employee involved justify such interception in the absence of authorization by the other party.*

The Supreme Court has shown every disposition to give the words of the statute their strict literal meaning. It is difficult to see, therefore, how the action of the Secretary of the Navy can be sanctioned under the Supreme Court decisions. Moreover, the *Polakoff* case seems even more in point. For in that case, the call was actually made from a government office and was intercepted by a device attached to an extension phone in the government office.

The Judge Advocate General of the Navy suggests in his memorandum that a member of the Naval Intelligence Service (or presumably any other employee of the Navy Department) employed as a switchboard operator should be permitted to divulge to a superior officer the contents of a conversation which he has received, assisted in receiving, or transmitted while assigned to duty at the switchboard. For the reasons just stated, such an interception would seem clearly prohibited by that portion of section 605 which has heretofore been considered. The Judge Advocate General argues, however, that interception in this manner would be justified under the first clause of section 605, which reads as follows:

> No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, sub-

---

* Editor's Note: Later, in *Rathbun*, the Supreme Court held that one-party consent was sufficient in some circumstances to permit the government to monitor and divulge communications without violating section 605. 355 U.S. at 108–11. *See also United States v. Hodge*, 539 F.2d 898, 905 (6th Cir. 1976) ("It is well settled that there is no violation of the Act if the interception was, as here, authorized by a party to the conversation.").

stance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such communication to its destination, or to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpena issued by a court of competent jurisdiction, or on demand of other lawful authority.

47 U.S.C. § 605.

It seems clear, however, that the purpose of the clause just quoted is to protect persons employed as telephone and telegraph operators whose duties as such require disclosure of communications to other persons. The suggestion of the Judge Advocate General contemplates the disclosure of communications by agents of the Naval Intelligence Service not in their capacity as switchboard operators, but in their capacity as wiretappers. The interception would, therefore, not seem justified under the provision quoted.

The Judge Advocate General argues that the words "on demand of other lawful authority" in the clause above cited includes the demand of a superior in the Department. This phrase, however, quite clearly refers to demands by administrative bodies, legislative committees and the like, not to demand by a superior for purposes not in connection with the receipt or transmission of the communication. In fact, the Judge Advocate General's interpretation—in effect permitting the superior officer of a telephone or telegraph operator to obtain and disclose any communication—would make the entire clause meaningless.

The Judge Advocate General also suggests in his memorandum that, since the government may permit the use of its telephone lines and equipment by persons outside the government on whatever terms it sees fit, it can by regulation, published in the Federal Register, stipulate as a condition for the use of its phones that all conversations be recorded and reported to lawful authority. It is argued that in this way any person voluntarily using the telephone would be deemed to have accepted the conditions and thereby "authorize" the recording and divulging of the conversation. My own feeling is that this proposal is a subterfuge which should not be approved for the following reasons:

1. The device proposed, if sanctioned, might well lead to a total breakdown of section 605. If the government can obtain constructive authorization in this way, presumably other users of the telephone can do the same thing. Thus any corporation, organization, or individual would be empowered to announce a similar condition; or the telephone or telegraph companies themselves would have authority to limit the use of their lines or wires on such terms. If the practice became widespread, the safeguards of section 605 would, of course, be entirely negatived.

2. I am inclined to doubt that, in view of the nature of the interests protected by section 605—the right to privacy—mere constructive notice of a regulation would be sufficient to imply authorization for interception of the communication. It is hard to see how an invasion of the right to privacy can be authorized by an individual who does not have actual knowledge of the invasion.

3. The device suggested would seem to be unquestionably unlawful in certain situations. Thus, where an individual was called from a government building without being aware of the fact that the call originated in such building, there can hardly be doubt that the interception would be prohibited by the statute. It would, of course, be impossible to separate out such calls from other calls which were being intercepted. On the theory of the *Weiss* case, which is based on the inability to separate intrastate calls from interstate calls, the device would not seem to be warranted.

Justice Holmes, dissenting in the *Olmstead* case, characterized wiretapping as "dirty business." *Olmstead v. United States*, 277 U.S. 438, 470 (1928). And Justice Roberts in the first *Nardone* case referred to it as a device "inconsistent with ethical standards and destructive of personal liberty." 302 U.S. at 383.

The Supreme Court has interpreted section 605 strictly in the light of this view of wiretapping. It does not appear, therefore, that the Court would approve any attempt to evade the comprehensive purpose of the statute, either by permitting the practice in government buildings or by attempting to secure constructive authorization.

I have talked informally with Mr. Telford Taylor, General Counsel of the Federal Communications Commission, and he agrees with the conclusions above expressed.

T.I. EMERSON[*]
*Attorney-Adviser*
*Office of the Assistant Solicitor General*

---

[*] Editor's Note: The author of this memorandum was Thomas I. Emerson, who later became a professor at Yale Law School, successfully argued the petitioner's case in *Griswold v. Connecticut*, 381 U.S. 479 (1965), and wrote a significant treatise on the First Amendment, *The System of Freedom of Expression* (1970). *See* Glenn Fowler, *Thomas I. Emerson, 83, Scholar Who Molded Civil Liberties Law*, N.Y. Times, June 22, 1991, at 21.