STATE v. RONALD MAXIE COLEMAN.

(Filed 24 May, 1967.)

1. Criminal Law § 155—

An assignment of error to the exclusion of evidence should set forth the evidence excluded so as to disclose within itself the question sought to be presented.

2. Criminal Law § 7—

Entrapment is the inducing of a person to commit a crime he did not contemplate doing, and the setting of a trap to catch a person in the execution of a crime of his own conception is not entrapment and is not a defense except in those cases in which the victim consents to the commission of the offense and want of consent is an essential element of the offense.

3. Same; Telephone Companies § 5— Entrapment held not available to defendant charged with making indecent telephone calls.

A number of indecent telephone calls had been made to women in the municipality in question who had placed advertisements in a newspaper indicating a woman would answer the call. Telephones were installed in the police department and an ad run in the paper seeking to sell a used mink stole. A policewoman was assigned to answer the telephone, and a diode device was placed on the line to trace calls. Defendant was charged with making an indecent telephone call over the line. *Held:* The defense of entrapment is not available to defendant, since the commission of the offense was of defendant's own conception and consent of the party called does not obviate the offense, G.S. 14-196.1, and therefore the exclusion of evidence tending to establish entrapment was not prejudicial.

**4. Criminal Law § 67—**

　　The victim of a lewd telephone conversation may testify upon hearing the defendant speak at police headquarters after his arrest that the voice she had heard over the telephone was that of the defendant, and any lack of assurance or uncertainty on the part of the witness affects the weight and credibility of the testimony but not its admissibility.

**5. Same—**

　　The admission in evidence of the tracing of the origin of a telephone call to the residence of defendant by use of a diode device preventing the breaking of the connection by the originator of the call, *held* not error, an employee of the telephone company having testified that he had supervised the installation and checked the device prior to the occasion in question, and there being testimony of witnesses that after the occasion in question the witnesses picked up the telephone and talked to the party called without dialing any number, the reliability of the diode device in this specific instance having been proven.

**6. Telephone Companies § 5;　Criminal Law § 33—**

　　The use of a diode device to prevent the originator of a telephone call from breaking the connection so that the telephone from which the call originated can be identified is to protect the telephone system from abuse by a threatening or obscene caller, and use of such device in no way violates the prohibition against wiretapping, since it does not involve the interception of any communication and the divulgence of its contents by a third person. 47 U.S.C.A. § 605.

APPEAL by defendant from *McLean, J.,* 4 April 1966 Regular Criminal Session of MECKLENBURG. Docketed and argued as Case No. 254, Fall Term 1966, and docketed as Case No. 264, Spring Term 1967.

　　Criminal prosecution upon an amended warrant charging that defendant on 5 December 1965 at and in Mecklenburg County and within the city limits of Charlotte did unlawfully, willfully, and maliciously use lewd and profane language and words of vulgarity and indecency over a telephone to Mary Thompson, a female person, a violation of G.S. 14-196.1, heard *de novo* on appeal from a conviction and sentence of imprisonment in the recorder's court of the city of Charlotte.

　　Plea: Not guilty. Verdict: "Guilty as charged in the warrant." From a judgment of imprisonment for a period of not less than 18 months nor more than 24 months, defendant appeals.

*Attorney General T. W. Bruton and Staff Attorney Wilson B. Partin, Jr., for the State.*

*Plumides & Plumides by John G. Plumides, Richard L. Kennedy and Jerry W. Whitley for defendant appellant.*

*Moore and Van Allen by John T. Allred for Southern Bell Telephone and Telegraph Company, amicus curiæ.*

PARKER, C.J.  The State's evidence in summary tends to show the following facts: Prior to 5 December 1965 there had been in Charlotte a number of telephone calls from a man or men in response to legitimate ads in the daily papers when it was apparent that a woman would answer. Typical of these ads were an ad, "girl to share an apartment with a girl," or "some woman had a room for rent," or "wearing apparel or something of that nature." The police department of the city of Charlotte, in order to catch the man or men who made such calls, had the Charlotte Observer on Sunday, 5 December 1965, to run the following ad: "EMBA MINK JACKET CAPE STOLE, slightly used. Will sell at a sacrifice. Nice gift. 334-3237." Mrs. Frances S. Sutton, an employee of the Charlotte Observer and the Charlotte News, composed this ad and had it placed in the Charlotte Observer. Telephone No. 334-3237 was installed in an office of the police department in the city of Charlotte.

Prior to 5 December 1965 Southern Bell Telephone and Telegraph Company had installed a diode device in a particular section of its telephone exchange in the city of Charlotte serving telephone No. 334-3237. The basic function of a diode on a telephone line is simply to prevent a disconnection when the originating or calling party hangs up. It does not identify the parties to a conversation or record the actual conversation; it merely enables the calling line to be identified. In essence, it denies the caller a get-away. The nature and operation of the diode was described at the trial by the State's witness T. G. Latham, a Southern Bell employee for the past thirteen years. He testified: "A diode device that we used gives joint or dual control of the call. In other words, what I mean to say there, may I give an example? When a person makes a call, he dials all of his numbers into the central office. When he dials each digit, each digit is handled by a separate piece of equipment. It in turn goes through the central office in a step by step fashion to each piece of equipment and then goes to the terminated equipment or the receiver's line. This is all done automatically and then it rings the receiver's line and they will talk and have a conversation or transmission. All right, the calling party has control over the connection. If we use this diode device, then it gives dual control; not only the calling party can hold the connection but the receiving party can also hold the connection if they leave their receiver off the hook. This is what happened in this case. The receiver left their phone off the hook, called us and requested that we make a trace on this call. . . . Without the diode, only the calling party has control. In other words, when they hang up the connection is dropped. As long as the calling party has their receiver off the hook, then they have control

but when they hang up the connection is dropped. . . . I supervised the installing of this device on this line. I didn't do the installation. I checked it out to see that it was functioning. I did that myself. . . . As to whether I am an expert, it doesn't take much of an expert to install them so I guess I'm an expert. I consider myself an expert on doing this. I am convinced beyond a shadow of a doubt that every time I placed it, it was perfect. No mishaps. It is a very reliable instrument." Mr. Latham also testified: "I received the telephone call from the police station at 9:22 A.M. It took me until 9:27 A.M. to make the trace — five minutes. I reported the results of my tracing to Sgt. Ross."

Mrs. Mary S. Thompson is an employee of the police department of the city of Charlotte, and was so employed on 5 December 1965. She was assigned by the police to answer three telephones that had been installed in the police department of the city of Charlotte. The number of one of these telephones was 334-3237. About 9:21 a.m. on 5 December 1965, the bell on telephone 334-3237 rang and she answered. The person calling her over the telephone asked her if she was the lady that had the ad in the paper about the mink cape for sale, and then he used to her over the telephone such lewd, vulgar, and indecent language that we will not soil the pages of our Reports with such filth. It is manifest that it is such language as is prohibited by G.S. 14-196.1. (Anyone who is interested in reading the language this person used to Mrs. Thompson can find it set out on pages 14, 15, and 16 of the record.) What the person said to her lasted from two and one-half to three minutes, and then this person hung up. She kept the receiver up and held it in her hand until she received a dial tone about 10:49 a.m. She recognized the voice of the person talking to her over the telephone as that of a male person. She did not have a mink cape stole for sale.

T. G. Latham was on duty on the morning of 5 December 1965 for Southern Bell Telephone and Telegraph Company. About 9:30 a.m. he received a call from the police department of the city of Charlotte to trace a call to telephone No. 334-3237. In response to that call, he went to a telephone building at 208 N. Caldwell Street in the city of Charlotte to the receiving equipment for telephone calls to 334-3237 by means of the diode device, and checked that call back on automatic devices to determine where the call originated. He testified: "We traced this call back to the originating line equipment and after we found the originating line equipment which was 85 and 152, we went to our service record cards and pulled the card on 85 and 152 and found that the number 334-6987 was on this 85 and 152 and it was registered, the phone was registered to a Reverend

Maxie Coleman. It was a private line, with no extensions in the house. . . . This phone is located at 1705 North Allen Street in the City of Charlotte."

Robert W. Fleming is employed as the Business Office Manager by Southern Bell Telephone and Telegraph Company in Charlotte, and as such he has control over the telephone listings for the city of Charlotte. Telephone No. 334-6987 in Charlotte is listed in the name of the Reverend Maxie Coleman, and his address is 1705 North Allen Street, Charlotte. It is a private line, with no extensions.

After the telephone call had been traced, police officers of the city of Charlotte went to 1705 North Allen Street in the city of Charlotte. Upon arrival they saw the defendant walking towards a 1957 blue and white Pontiac parked at the curbing in front of the house, get in it, and leave. The officers followed him for about two and one-half blocks, got his license number and had it identified through the police station. They lost him in traffic. They went back to 1705 North Allen Street to observe the house. Later on, the defendant driving the 1957 Pontiac parked again in front of 1705 North Allen Street. Defendant then left this house and went to his car and got in on the driver's side. The officers drove up, identified themselves to the defendant, and asked who lived at 1705 North Allen Street. He stated that he did. After Officers Bruce S. Treadaway and Marshall Haywood went into the house with defendant, Officer Ross arrived with an arrest warrant and told defendant that he was under arrest and advised him as to his rights to counsel, that he did not have to make a statement unless he so desired, and that if he said anything it could be used against him. Officer Treadaway testified that "at that time I picked up the telephone and had conversation with Mrs. Mary Thompson without dialing the phone. I picked up the receiver. I hung the phone back up. Officer Ross picked it back up off the cradle. He had a conversation with someone. He didn't dial the phone." Pertaining to the same matter, Sergeant C. W. Ross testified in substance, except when quoted, as follows: He took the phone from Officer Treadaway and talked to the party on the other end of the line. "I recognized the voice. In my opinion, it was Mrs. Mary Thompson on the other end of the line." The officers took defendant to police headquarters. Defendant stated that his mother and father left about 9:00 or 9:05 a.m. to go to church, and that he was alone in the house from that time until the time the officers first drove up.

During a conversation at police headquarters, Mrs. Mary S. Thompson listened to the defendant talk. Mrs. Thompson testified in substance that she heard the defendant talk at the police station

and the voice of the defendant was the voice of the man who had used lewd, vulgar, and indecent language to her over the. telephone that morning. On recross-examination of Mrs. Thompson by Mr. Plumides, the record shows this:

"Q. That's the only other time you ever heard his voice, other than on the telephone, wasn't it?

"A. When he made the statement, 'No, lady, I've never talked to you before,' the way he used 'lady' in his words, 'are you the "lady" with the cape for sale?'

"That was not altogether the basis of my opinion. That was part of it. I didn't talk to him more than twenty to thirty seconds; that was enough to convince me. I was not helped in my opinion by the fact that he had already been brought to the Police Station by the police officers. He was the only one they had in custody at that time, but that didn't help influence my opinion."

Defendant offered no evidence.

Defendant assigns as error the following:

"EXCEPTION No. 5. (R. p. 11) Defense counsel attempted to establish on cross examination that a certain advertisement was put in The Charlotte Observer with the intention of enticing male callers. Questions attempting to elicit the purpose for which the ad were *(sic)* placed were objected to and the objections were sustained. To this the defendant excepts and assigns this as his Assignment of Error No. 5."

We have to go beyond this assignment of error on a voyage of discovery through the record to find out the excluded testimony to which the defendant excepts. This assignment of error, like many of defendant's other assignments of error, does not comply with our Rules of Practice in the Supreme Court. *Balint v. Grayson,* 256 N.C. 490, 124 S.E. 2d 364; *Lowie & Co. v. Atkins,* 245 N.C. 98, 95 S.E. 2d 271. On our voyage of discovery it appears from the record that the excluded testimony is as follows:

"They were written like the ones that had been receiving calls for the legitimate ads, like 'girl to share an apartment with a girl' or some woman had a room for rent or wearing apparel or something of that nature. These were the type of ads that the caller had been hitting, where he knew a woman would answer."

Defendant contends that the exclusion of this evidence prevented him from developing his defense of entrapment. This assignment of error is overruled.

The defense of entrapment, as understood and defined in the criminal law, was not available to defendant under the evidence. This Court said in *S. v. Burnette*, 242 N.C. 164, 87 S.E. 2d 191, with plenary authority to support the statement:

> "A clear distinction is to be drawn between inducing a person to commit a crime he did not contemplate doing, and the setting of a trap to catch him in the execution of a crime of his own conception. [Citing authority.]
>
> "It seems to be the general rule in those cases where the doing of a particular act is a crime regardless of the consent of anyone, that entrapment is not available as a defense to a person, who has the intent and design to commit a crime originating in his own mind, and who does in fact commit all the essential elements constituting it, merely because an officer of the law, or another, in his effort to secure evidence against him for a prosecution, affords him an opportunity to commit the criminal act, or purposely places facilities in his way or aids and encourages him in the perpetration of the crime which had its genesis in his own mind."

The rule stated in the *Burnette* case applies here. The police of Charlotte merely set a trap to catch defendant in the execution of a crime which had its genesis in his own mind. The ad in the Charlotte Observer merely created an opportunity for defendant to commit the crime. Defendant used the telephone to call Mrs. Thompson, and he used the lewd, vulgar and indecent language over the telephone to her such as is condemned by G.S. 14-196.1.

Defendant in his brief relies upon *S. v. Nelson*, 232 N.C. 602, 61 S.E. 2d 626 (captioned as *S. v. Nelon* in the Southeastern Reporter). That was a case wherein defendant was charged with an assault with intent to commit rape. In certain crimes consent to the criminal act by the person injured, *e.g.*, rape and assault with intent to commit rape, eliminates an essential element of the offense, and is therefore a good defense. *S. v. Burnette*, *supra*. Consent is not an essential element of the offense condemned by G.S. 14-196.1. The law as stated in the *Nelson* case is not applicable to the instant case.

Defendant assigns as error that the court erred in permitting Mrs. Mary S. Thompson, after listening to defendant talk in the police station, to testify that in her opinion the voice she heard over the telephone using the lewd, vulgar and indecent language was the voice of defendant. This assignment of error is overruled. Mrs. Thompson heard the defendant talk at police headquarters after he was arrested, and she expressed the opinion that the voice heard by her over the telephone using lewd, vulgar and indecent words was

that of defendant. Any lack of assurance or uncertainty on the part of Mrs. Thompson identifying defendant by voice recognition affects only the weight and credibility, and not the admissibility of her testimony. As a general rule, the weight of voice recognition is a question of fact for the jury. *S. v. Hicks,* 233 N.C. 511, 64 S.E. 2d 871, *cert. den.* 342 U.S. 831, 96 L. Ed. 629; *McGraw v. State,* 34 Ala. App. 43, 36 So. 2d 559, petition for *certiorari* dismissed 251 Ala. 123, 36 So. 2d 560; *Taylor v. State,* 75 Ga. App. 205, 42 S.E. 2d 926; *State v. Clyde,* 388 P. 2d 846 (Hawaii 1964); Stansbury, N. C. Evidence, 2d Ed., § 96, p. 226; Annot. 70 A.L.R. 2d 995, "Identification of accused by his voice."

Defendant has an assignment of error reading as follows:

> "EXCEPTION No. 15. (R. p. 43) A State's witness was permitted to testify about a device installed on one of the telephone lines in question without first having qualified the device as being accurate, or as having been carefully tested for accuracy. To this the defendant excepts and assigns this as his Exception No. 15."

This assignment of error does not comply with our Rules of Practice, because it does not disclose the question sought to be presented without the necessity of going beyond the assignment of error itself. Rules of Practice in the Supreme Court, Rule No. 21; *Lowie & Co. v. Atkins, supra.* Embarking on another voyage of discovery through the record, we find on page 43 of the record this: "Q. What type of device had you [T. G. Latham] installed? MR. PLUMIDES: OBJECTION. COURT: OVERRULED. Exception. DEFENDANT'S EXCEPTION No. 15." On the same voyage of discovery we find Latham's answer on page 44 of the record, which is: "It was a diode device," and then he testified as to the basic function of a diode on a telephone line, as set forth verbatim above. Mr. Latham testified on cross-examination as follows: "I supervised the installing of this device on this line. . . . I checked it out to see that it was functioning. . . . As to whether I'm an expert, it doesn't take much of an expert to install them so I guess I'm an expert. I consider myself an expert on doing this. I am convinced beyond a shadow of a doubt that every time I placed it, it was perfect. No mishaps. It is a very reliable instrument." The testimony of Officer Treadaway when they were in the house at 1705 North Allen Street with defendant and picked up the telephone there in the house is as follows: "At that time I picked up the telephone and had conversation with Mrs. Mary Thompson without dialing the phone. I picked up the receiver. I hung the phone back up. Officer Ross picked it back up off the cradle. He had a conversation with someone. He didn't dial the

phone." Treadaway's testimony shows the diode was functioning properly. The reliability of the diode is measured in terms of its ability to keep the switches open. If the diode had not been performing properly, the switches would have closed, Officer Treadaway could not have had the conversation with Mrs. Thompson without dialing the number of the telephone she was at in the police station, and the manual line tracing procedure would not have been possible. In this case, the identification of the calling line and number was made, and the reliability of the diode speaks for itself. Defendant's assignment of error is overruled.

Defendant's assignment of error No. 18 is as follows:

"EXCEPTION No. 18 (R. p. 49). The defendant moved to strike certain evidence on the ground that it was illegally obtained as the result of an illegal wiretap, and on the second ground that it was obtained as the result of an entrapment. To the denial of this motion, the defendant excepts, and assigns this as his Assignment of Error No. 18."

Embarking on another voyage of discovery through the record, we find on page 49 of the record this:

"MR. PLUMIDES: First, I'd like to make a motion to quash any evidence made or given as a result of this line being left open and which directly relates back to the evidence of Mary Thompson, based on my argument if I might at this time."

Defendant contends in his brief "though it has been held that Section 605 of the Federal Communications Act does not apply to States . . . the defendant argues this contention that the evidence obtained with the diode device should be excluded as violating Section 605 of the Federal Communications Act."

The function of a diode device is not to overhear or record or divulge a telephone conversation. Its function is merely to permit a called person to maintain the connection, and thereby enable the successful identification of the calling telephone number. It protects the telephone system from abuse by a threatening or obscene caller. The use of a diode device in no way violates the literal language or the legislative intent of Section 605 of the Federal Communications Act, 47 U.S.C.A., which prohibits wire tapping. The purpose of this statute is to prevent public or private encroachment on the privacy of the contents of a conversation over a telephone or a communications system. Nardone v. United States, 302 U.S. 379, 82 L. Ed. 314. The diode device, and those connected with its installation and use, did not induce or advise defendant to make the obscene telephone call, but the diode device and the persons merely

created a condition under which the offense of making obscene tele-phone calls by a male person to a female person could be commit-ted. This is not an entrapment. *S. v. Burnette, supra.*

In *Rathbun v. United States,* 355 U.S. 107, 2 L. Ed. 2d 134, reh. den. 355 U.S. 925, 2 L. Ed. 2d 355, a majority of the Supreme Court of the United States held as stated in the 1st head note in 2 L. ed. 2d 134:

> "No violation of the provision of § 605 of the Federal Com-munications Act (47 U.S.C. § 605) that no person not being au-thorized by the sender shall intercept any communication and divulge the existence or contents of such intercepted communi-cation to any person is involved in the use, with the consent of one party to a telephone conversation, of a regularly used tele-phone extension to overhear the conversation; hence a convic-tion of the crime of transmitting an interstate communication threatening the life of another, in violation of federal statute (18 U.S.C. § 875(b)), is not vitiated by the admission in evi-dence of the contents of a telephone conversation, so overheard, in the course of which the threat in question was made."

In accord: *Seeber v. United States,* 329 F. 2d 572; *Carnes v. United States,* 295 F. 2d 598, *cert. den.* 369 U.S. 861, 8 L. Ed. 2d 19. In the *Carnes* case, the Court held:

> "Evidence obtained by recording or by listening to telephone conversation with consent of one of the parties but without knowledge or consent of the other is admissible. Communica-tions Act of 1934, § 605, 47 U.S.C.A. § 605."

Defendant's assignment of error No. 18 is overruled.

All of defendant's other assignments of error have been care-fully examined. None is sufficient to justify disturbing the trial be-low, and all are overruled. The study of this case and the writing of this opinion have been laborious, for the reason that defendant has almost totally disregarded the Rules of Practice in this Court in his preparation of his assignments of error.

It is a matter of common and general knowledge that the abusive, threatening or obscene telephone call has become an unpleasant and all too often an encountered reality of life in America today. These acts are the more reprehensible, because they are very often directed against female persons. For this reason, the North Carolina General Assembly, along with most other states, has enacted a statute to deal with this menace. G.S. 14-196.1. Until recent years there existed almost no reliable methods by which this statute and similar stat-utes could be enforced. Until recently, relying upon the character-

istic anonymity of the telephone, the obscene caller could commit his crime in a matter of seconds, break the connection, and relax, secure in the knowledge that he could not be detected. Further, he could safely repeat his crime as often as he wished by the simple precaution of never talking too long to any one person. The basic function of a diode device is to permit the identification of the calling telephone number by preventing the caller from breaking the connection once he has completed the commission of his crime. It has performed a useful purpose. No wonder defendant, like all other persons caught in a trap in the commission of a crime originating in his own mind, viciously assails the trap. See an article published in the July 1966 issue of *Coronet* magazine by Al Bernsohn entitled "New Ways to Nab Sex Offenders."

In the trial below we find

No error.